Todd M. Friedman (State Bar No. 216752)
Adrian R. Bacon (State Bar No. 280332)
**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
21550 Oxnard St., Suite 780
Woodland Hills, CA 91367
Tel: (877) 206-4741
*tfriedman@toddflaw.com*
*abacon@toddflaw.com*

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES SWEET; CHUCK MERE; ZOMBIE GO BOOM, LLC, DBA ZOMBIEGOBOOM<br><br>Plaintiffs,<br><br>vs.<br><br>GOOGLE, LLC; YOUTUBE, LLC; and DOES 1-10, inclusive,<br><br>Defendant. | Case No. 3:17-cv-03953-EMC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

## OVERVIEW OF THE ACTION

1.      This Class Action case surrounds widespread anticompetitive and unfair conduct of a monopolistic enterprise, which, through intentional, reckless and/or negligent means, has economically stifled the pursuits of enterprising and creative content providers, causing significant loss of revenue and profit.  Specifically, Plaintiffs James Sweet and Chuck Mere, who own and operate Zombie Go Boom, LLC, and who collectively do business as Zombiegoboom ("Plaintiffs"),[1] bring this action against Defendants Google, LLC (hereinafter "Google") and YouTube, LLC (hereinafter "YouTube").

2.      Content providers, such as Plaintiffs, who use the YouTube forum to post their creative works are wholly reliant, from a revenue stream standpoint, on the ability to monetize their content through advertisements placed by YouTube, in accordance of the terms and conditions these content providers, such as Plaintiff, agree to when engaging with YouTube.  Content providers, such as Plaintiff, earn revenue from YouTube when consumers click and/or view the content provider's videos.  YouTube's contract with content providers permits for advertisements to be placed on content provider's videos, Content providers receive revenue from YouTube when an advertisement is viewed and/or clicked on by a content consumer.  The terms governing the payment of revenues through YouTube's advertising monetization plan have been established and ongoing for years, and while not fully transparent, are largely predictable by businesses and content providers which create content and place it on YouTube.  Without an advertisement being posted on a content provider's video or channel in the first instance, no revenue can be generated by the content provider through YouTube's content provider advertising program.  Based on criteria created internally, YouTube acts as a unilateral gatekeeper in deciding which videos will be monetized.  Until recently, this has never presented a problem, and has been applied by YouTube with an even hand.

3.      Plaintiffs have monetized their creative entertainment content, which include hundreds, if not thousands of videos that they created, and filmed at their expense, through YouTube since 2011.  Zombiegoboom has become one of the top YouTube channels since that time, with over 1.6 million subscribers to its channel, and millions of video views per month.  Despite this overwhelming

[1] Zombiegoboom's content can best be described as a cross between popular cable TV shows Mythbusters and The Walking Dead.

CLASS ACTION COMPLAINT

success and high demand for Zombiegoboom content by the content consumers using YouTube's services, Zombiegoboom's revenues have plummeted by over 90%, to the point where they can no longer afford to stay in business, due to YouTube's unilateral and radical modifications to their ad program's terms and conditions, with reckless disregard, and without notice, of content providers, such as Plaintiff, that have made it a success to the public.

4.   Leading up to March 2017, YouTube began receiving negative press in a series of Wall Street Journal articles[2] which criticized YouTube for permitting racist and objectionable content (such as Neo-Nazi and ISIS support videos) to be monetized through the placement of advertisements played during these videos.  These articles in turn led some of YouTube's advertising partners to put pressure on YouTube to ensure that their advertisements were not on such videos.[3]

5.   In or around March 2017, including specifically on March 20, 2017, in response to growing concerns, YouTube modified their terms and conditions by releasing new guidelines, which purported to set forth a set of restrictions upon the placement of advertisements through YouTube's content providers' videos that did not meet YouTube guidelines.  Such guidelines included sexually explicit, racist, hateful, incendiary or overtly violent videos.[4]  These guidelines were never provided to or explained to content providers, such as Plaintiffs, nor were they ever agreed to by content providers.  The guidelines were applied retroactively across all content that had previously been created at the expense of the content providers, including content which had been on YouTube without complaint from advertisers or content viewers for years.

6.   In order to quickly and efficiently implement these guidelines, YouTube created a program with a proprietary algorithm, which it withheld from members of the public, and from content providers, and which was supposed to demonetize any videos which failed to meet its new vague content guidelines.  However, these algorithms were never shared with content providers, and

---

[2]     https://www.wsj.com/articles/googles-youtube-has-continued-showing-brands-ads-with-racist-and-other-objectionable-videos-1490380551

[3] Zombiegoboom does not in any way shape or form fit the mold of the types of videos that were subject to these news reports, or which derivatively drew ire from advertisers.  Indeed, many of the advertisers that feature their advertisements on YouTube, also advertise on popular television shows such as The Walking Deal, and Mythbusters, which are similar forms of entertainment, and offer an analogous target market of viewership.

[4] https://youtube-creators.googleblog.com/2017/03/strengthening-youtube-for-advertisers.html

were never disclosed to content providers, either at the time they signed up with YouTube as a content provider, or at any point subsequent to such time, in any meaningful fashion.

7. The algorithms did not work. They under-inclusively failed to capture and demonetize content that was sexually explicit, racist or otherwise not in compliance with the spirit of the guidelines, while over-inclusively demonetizing content that did not violate the spirit of the guidelines and was not objectionable to advertisers (such as Plaintiffs' videos). The result were thousands of content providers suddenly having their livelihoods jeopardized with the flick of a switch by YouTube, without explanation, notice, or recourse.

8. This case is brought on behalf of the content providers (like Plaintiffs) who were creating content and placing it on YouTube, at great expense, well within the spirit of the guidelines, and yet whose videos were targeted and demonetized anyways due to YouTube's draconian and reckless application of its demonetization algorithms.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because (a) at least one member of the Class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the Class includes more than 100 members, and (d) none of the exceptions under the subsection apply to this action.

10. Venue is proper in this district under 28 U.S.C. § 1391(b) because YouTube's principal place of business is here, and a substantial part of the events or omissions that give rise to Plaintiffs' claims occurred here. YouTube executives and employees devised and carried out the scheme underlying these claims at YouTube's headquarters in San Francisco, California.

## PARTIES

11. Defendant Google, LLC is a Delaware Limited Liability Company headquartered in Mountain View, California. Google, Inc. purchased YouTube, Inc. in 2006.

12. Defendant YouTube, LLC was purchased by Google, LLC in 2006, when the company was then known as YouTube, Inc. YouTube, LLC is a Delaware limited liability company with its principle place of business is in Mountain View, California.

CLASS ACTION COMPLAINT

13. YouTube's terms and Conditions, which can be found here: https://www.youtube.com/t/terms, specify that content providers' agreements are to be governed by the law of California. These same Terms and Conditions do not contain an arbitration clause.

14. The above named Defendant, and its subsidiaries and agents, are collectively referred to as "Defendants." The true names and capacities of the Defendants sued herein as DOE DEFENDANTS 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

15. Plaintiff is informed and believes that at all relevant times, each and every Defendant was acting as an agent and/or employee of each of the other Defendants and was acting within the course and scope of said agency and/or employment with the full knowledge and consent of each of the other Defendants. Plaintiff is informed and believes that each of the acts and/or omissions complained of herein was made known to, and ratified by, each of the other Defendants.

16. Plaintiff Zombie Go Boom, LLC is an Arkansas corporation, with its principle place of business in Fayetteville, Arkansas.

17. Zombie Go Boom, LLC is produced by 3 time Emmy Award winning television creative director James Sweet and Emmy Award winning independent filmmaker Chuck Mere. Zombie Go Boom, LLC is owned by James Sweet and Chuck Mere, and operates the YouTube channel Zombiegoboom.

18. Plaintiffs James Sweet and Chuck Mere are citizens of Arkansas.

## COMMON FACTUAL ALLEGATIONS

19. YouTube is an American video-sharing website, which contracts with content providers to upload videos, to be viewed by members of the public worldwide, and YouTube would monetize the videos for content providers, by attaching advertisements to the videos. Users can view, share, rate or favorite videos, as well as add comments, and subscribe to channels of content providers whose content they may enjoy and wish to view regularly.

4

20.     YouTube permits many forms of original content, including videos, television shows, music videos, films, educational videos, short original videos, and other similar forms of content. Content can include such areas as political speech, comedy, education, entertainment, or other forms of artistic expression.  All other things equal, there are no limits on the types of content that one is physically able to post on YouTube.

21.     A large percentage of YouTube's traffic relates to original content providers who create original videos for the express purpose of gathering subscribers to their YouTube Channel.  Views and subscribers typically translate into revenue for the content providers, due to YouTube's monetization schedule.

22.     YouTube monetizes its content by permitting third party advertisers, such as Wal-Mart, Verizon, General Motors and many others, to place advertisements at the beginning of videos. YouTube AdSense program ultimately decides on whether to monetize the videos of a content provider.  Typically when a user clicks on a video of a content provider that they wish to view, an advertisement will play before the video begins.  Users can click on the advertisement to be directed to the advertiser's website.  YouTube's advertisement placement algorithm is controlled by Google AdSense, a program which targets ads according to site content and audience. The Google AdSense program ultimately decides on whether to monetize the videos of a content provider.

23.     Depending on the circumstances of whether a) the advertisement is viewed, b) the advertisement is viewed in full, or c) the advertisement is clicked on by a user, YouTube will pay to content providers, incentivizing content providers to focus on creating content as a full time job, portions of the fees collected from third parties, whose advertisements appear on the content provider's videos.

24.     Many successful content providers have been able to earn a living wage, or even in excess of $100,000 annually by working exclusively as a YouTube Content provider.  Plaintiffs fell into this category, with over 1.6 million subscribers to the Zombiegoboom channel, and millions of views to their videos each month.  Zombiegoboom is presently one of the top 2000 YouTube Channels in the world, which puts it in the top 1% of YouTube revenue earners.

CLASS ACTION COMPLAINT

25.     Content providers, including Plaintiffs, have come to rely on this steady stream of revenue/income, as they continue to put out new content to be viewed by the world.  For instance, Plaintiffs have come to expect that in a slow month, they can earn approximately $10,000, and in a good month, they can earn approximately $15,000.  Typically, based on several years of experience as a YouTube content provider, Plaintiffs' viewership to revenue rate is such that one million views translates to approximately $1000-$2000 in advertising revenue passed through to Zombiegoboom.

26.     Plaintiffs have come to rely on these proportions of viewership-revenue, as they have translated like clockwork since approximately 2011 when they founded the Zombiegoboom channel. Plaintiffs have, in reliance on these figures, continued to put out new and interesting content on YouTube which is demanded by the public at large (as evidenced by the number of views and subscribers to the Zombiegoboom channel).  In so relying, Plaintiffs have spent resources, including time, labor, artistic vision and money, into creating new content exclusively for YouTube, with the expectation that, as long as people want to watch the content, Plaintiffs will continue to get paid at the same rate that they have historically been paid.

27.     Plaintiffs have carved out a decent living while also engaging in a career that they love (creative and entertaining filmmaking), through the Zombiegoboom YouTube channel.

28.     In early 2017, YouTube was hit with a wave of bad press, because the Google AdSense program was allegedly placing advertisements on videos that contained hate speech and sexually explicit material.  For instance, several articles, including a string of articles in the Wall Street Journal, reported that YouTube's AdSense program had placed advertisements for companies such as Pepsi, on videos of ISIS supporters and Neo-Nazis spouting hate speech.

29.     Advertisers were disturbed by these reports, and there was a backlash where approximately five percent of YouTube's advertisers backed out of agreements to place their advertisements on YouTube's content providers' videos.  Big name advertisers such as Pepsico, AT&T, Dish and Starbucks were reported to have pulled the plug on continuing to advertise through YouTube.com, as fear grew that their advertisements might be associated with undesirable videos of fringe lunatics.  YouTube was thus highly financially incentivized to quickly address these concerns in order to stop the bleeding and prevent further advertisers from withdrawing their support of

YouTube's content, which almost universally contained content that was no less appropriate than what could be viewed on cable television, where these same advertisers were already placing their advertisements and willingly associating their products and services.

30.     YouTube responded to these concerns by altering the algorithms in the AdSense program, in an attempt to automatically weed out inappropriate content, without the use of human oversight.[5]  In doing so, YouTube's new algorithms were poorly executed, such that the very types of content that were subject to the ire of news reports and advertisers were still not being properly screened out of monetization (resulting in advertisements still appearing on such videos), while content that was not any more inappropriate than what someone would see by turning on AMC or Discovery Channel might see in their living rooms on cable television was nonetheless screened and demonetized.

31.     Zombiegoboom, along with thousands of other appropriate and successful YouTube channels, was victimized by YouTube's over-inclusive alterations to the AdSense algorithms.

32.     YouTube implemented the revised algorithms around March, 2017.  YouTube content providers and online bloggers have dubbed this date "Adpocolypse."[6]  As an example of Plaintiffs' loss of revenue due to the AdSense changes, Plaintiffs earned approximately $10,000 through advertisement revenue generated through the Zombiegoboom YouTube channel in February 2017.  In March, 2017, that figure dropped to $8,000.  After March 27, 2017, Zombiegoboom's advertisement revenue plummeted from an average of $300-$500 per day to $20-$40 per day, a 90-95% drop in revenue overnight.   This was despite the fact that viewership of creative content posted by Zombiegoboom remained steady.  The proportion of revenue received dropped significantly because advertisements were no longer being placed on Zombiegoboom videos, due to the content having been screened and labeled as demonetized by AdSense.  Case in point, pre-March 27, 2017, one million views on the Zombiegoboom channel would translate to approximately $1,000-$2,000 in

---

[5] YouTube could have implemented a new protocol whereby it employed individuals to watch videos and ensure that their content fit the criteria of advertisers before approving said videos for monetization, but instead used automated algorithms to attempt to replicate that process, presumably at a much less expensive cost.

[6] A video of a YouTube Producer describing the issue can be viewed here: https://www.youtube.com/watch?v=XqDWE-wreJM&feature=youtu.be

revenue.  Post-March 27, 2013, one million views on the Zombiegoboom channel would translate to approximately $150 in revenue.

33.    YouTube implemented a secret rating system that is only available to be viewed by YouTube and advertisers which automatically rates videos using the AdSense algorithms, in a similar way to movie ratings (G to R) or video game ratings such as E (for everybody) to M (for mature). After the videos are automatically put into a category, advertisers can then chose to filter their advertisements to only be placed on certain categories of videos.  None of this was ever explained to Plaintiffs or to other content providers, despite the fact that it was essential to their businesses to know how they would ultimately be paid through advertising placed on their YouTube videos. Plaintiffs and other content providers never received notice of updated terms and conditions regarding the changes to content advertisement.   By not telling content providers that this rating system existed, or how the algorithm worked, YouTube was causing damage to content providers, because the lack of transparency and notice of the changes to the algorithms led content providers to make different types of content than they otherwise would have been making, to maximize their profits.

34.    Replicating the pre-March 27, 2017 revenue became impossible for Plaintiffs, as it would have required hundreds of millions of views per month, just to make ends meet.  At the time, Plaintiffs' YouTube channel was receiving 6-10 million views per month, which is roughly equivalent to the number of views that a popular television show on cable would receive.  And yet, Plaintiffs were not even being paid enough to cover the costs of making their content, due to their videos being demonetized.

35.    Zombiegoboom content was denied the opportunity for an appeal of the demonetization decision, and Plaintiffs were given no explanation by YouTube, despite numerously requesting answers.

36.    YouTube never provided any advanced notice to Plaintiffs that it would be altering its revenue model, in any meaningful fashion that provided sufficient specifics for Plaintiffs to be put on notice that any changes might affect their Channel.

37.     YouTube never provided Plaintiffs any advanced notice that it would be implementing and new terms by which Plaintiffs' videos must adhere, which indicated to Plaintiffs that their content might be subjected to demonetization.

38.     Plaintiffs never received any communication from YouTube indicating a change in its terms and conditions, specifically to the changes in the monetization of videos, nor agreed to any changes in YouTube's terms and conditions, specifically, to the change in the monetization policy.

39.     The only such communication received by Plaintiffs focused on YouTube's desire to demonetize hate speech.  Plaintiffs' videos contain no hate speech.

40.     Plaintiffs' videos are not "otherwise objectionable," nor are they undesirable or offensive.   In fact, the demonetization algorithms implemented by YouTube in the advent of Adpocalypse frequently function in a manner that demonetizes content providers whose videos are not undesirable or offensive.  One of thousands of examples of this is shown in the following video: https://www.youtube.com/watch?v=ppcYoem3URo.    It features the popular content provider "TheReportOfTheWeek" who has nearly half a million subscribers.  He explains how he had a video demonetized for a "review for a burger" as having been objectionable based on YouTube's demonetization algorithm, and his subsequent frustration and confusion.  YouTube's demonetization algorithm does not effectively target only objectionable, undesirable or offensive content.  Plaintiffs assert that the removal of their content by YouTube is not within You Tube's editorial discretion.

41.     YouTube's Terms of Service, identified above, do not contain any advanced notice or indication whatsoever that YouTube retains the rights to unilaterally alter the terms by which content providers will be entitled to receive revenue or have their content monetized or demonetized.

42.     YouTube intentionally withholds information from content providers regarding the existence of this hidden AdSense algorithm, so as to maintain secrecy and control over its revenue stream, which not only unfairly leaves content providers in the dark as to the status of their livelihoods, but also stifles growth and opportunity by discouraging content from being created and posted in the first place.

CLASS ACTION COMPLAINT

43.     Plaintiffs relied on the fact that they were historically receiving $1,000-$2,000 per million views in revenue from their content in creating new content and continuing to participate as a top YouTube Channel.

44.     Plaintiffs suffered tens of thousands of dollars in tangible and calculable harm as a result of YouTube's decision to, without advanced notice, alter the terms of Plaintiff's revenue sharing agreement with YouTube.  In fact, if this demonetization of Plaintiffs' content continues, Plaintiffs will have to shut down the Zombiegoboom Channel and find other work.

45.     Prior to Adpocalypse, Plaintiffs were offered $60,000 by an interested buyer who wanted to purchase all of Plaintiffs' existing online content.  After adpocalypse, the buyer has recinded the offer, and now has represented that they would not be able to come close to paying anything near that amount.

46.     As an additional example of harm suffered, Plaintiffs were receiving advertising deals outside of the context of YouTube for $25,000 to promote other products through a video advertising the goods/services, including video games such as Dead Rising, prior to Adpocolypse.   After Adpocalypse, Plaintiffs reached out to an advertising partner and explained the situation regarding their drop in revenue, and agreed to a lower contracted price of creating a video of $3,500.  Due to YouTube's restrictions on Plaintiffs' videos, the response rate to the video created by Plaintiffs did not garner the business that was anticipated, and the advertiser was ultimately forced to reduce the compensation to Plaintiffs to $1,150.

47.     YouTube's Adpocalypse-related conduct, in particular its lack of transparency with Plaintiffs regarding its AdSense algorithms, and failure to provide advanced notice of these changes, interfered with Plaintiffs' contractual relationships with other business partners, rendering them considerably less valuable, as a direct attributable result of YouTube's conduct.

48.     YouTube continued to benefit from Plaintiffs' placement of new content on YouTube's website following March 27, 2017, through users being drawn to the YouTube website as a result of Plaintiffs' creative work and labors, including through YouTube receiving additional revenues through advertisements or otherwise that were viewed by these users. YouTube also benefited from existing content created and uploaded by Plaintiffs that is already present and existent on YouTube,

which continues to attract new users to come to YouTube.com and view Zombiegoboom videos and other videos.

49.     YouTube sent vague communications to Plaintiffs throughout the process of implementing its AdSense changes, which indicated that content providers would only be subject to demonetization if their videos contained hate speech, or were personally de-selected by advertisers.

50.     YouTube also represented to Plaintiffs that it was concerned about the livelihoods of its creators, and thus, it would be providing an appeal process if a content provider felt their video was being unfairly demonetized.    However, Plaintiffs requested appeals of YouTube's decision to demonetize their content and never received any feedback as to why their videos were demonetized or whether any appeal could be initiated.  YouTube ignored Plaintiffs' repeated requests for review.

51.     Plaintiffs allege on information and belief that content providers were not the sole cause of the precipitous drop in revenue suffered by Plaintiffs, and that YouTube's demonetization algorithms were primarily to blame.  This allegation is based in large part on the fact that the content of Plaintiffs' videos is similar in nature to content that is present on popular TV shows such as Mythbusters and The Walking Dead (though significantly less violent or graphic than The Walking Dead), and yet many of the advertisers whose ads previously appeared on Plaintiffs' content also place their advertisements on Discovery Channel and AMC.

52.     YouTube was aware that this issue was causing widespread discord with its content providers, as evidenced by a posting it made on its own website: https://youtube-creators.googleblog.com/2017/06/your-content-and-making-money-from.html.  YouTube states: [w]e know that revenue fluctuations have been unsettling and want to reassure you that we're working closely with our advertising partners to make sure that YouTube continues to be a great place for creators to earn money. We recognize there is still more work to do. We know we have to improve our communications to you, our creators. We also need to meet our commitment to our advertisers by ensuring their ads only appear against the content they think is suitable for their brands."  YouTube goes on to admit that it is receiving a large volume of complaints from content providers about a lack of transparency with regard to the terms which are governing the revenue streams that act as the lifeblood of these creative content providers.

CLASS ACTION COMPLAINT

53.     YouTube has a duty to disclose, with detailed specificity and complete transparency, the terms by which content is selected or deselected for monetization, as well as the structure of payments that will be provided to content providers as a result of advertising revenue generated, to its content providers, because content providers rely on an expected revenue stream as a source of income, and require these assurances in order to invest in the expense and time necessary to create new content.   Failing to disclose this essential information to content providers, along with maintaining unilateral control to change the terms and conditions which govern the payment received by content providers for their creative work is anti-competitive, harmful to the creative content market, and also a breach of good faith and fair dealing.   Content providers gain nothing by such a lack of transparency, and YouTube gains everything by withholding this information, and keeping its content providers chained and in the dark.

54.     Plaintiffs seek a Court Order mandating that YouTube make its revenue sharing rules, including both the demonetization/monetization qualifications and programming, and the structure by which content providers are paid a share of advertising revenue generated from their content, available in complete form to content providers at the time that they first contract with YouTube to provide such services to YouTube.   Plaintiffs allege that this is necessary to prevent another incurrence of Adpocalypse.   Plaintiffs also seek monetary damages against YouTube on behalf of content providers whose revenue streams were negatively impacted by Adpocalypse.

## CLASS ACTION ALLEGATIONS

55.     Plaintiffs bring this action under Federal Rule of Civil Procedure 23 on behalf of the following Class and Subclasses:

### The Class

All content providers in the United States who uploaded content on YouTube.com at any point since 2006, and whose videos were available for public viewing on YouTube.com during the time frame of March 1, 2017 to present.

Excluded from the proposed Class are YouTube's officers, directors, legal representatives, successors, and assigns; any entity in which YouTube has a controlling interest; and judicial officers to whom this case is assigned and their immediate family members.

56.     Plaintiffs reserve the ability to modify the definition of the proposed Class before the Court determines whether class certification is warranted.

57.     The requirements of Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3) are met in this case.

58.     <u>Numerosity</u>. The Class consists of thousands of content providers, making joinder of each Class member impracticable. The Class is presently ascertainable by reference to objective criteria and based on records within YouTube's possession.

59.     <u>Commonality and Predominance</u>. Common questions of law and fact exist for each of the causes of action and predominate over questions affecting only individual Class members. Questions common to the Class include:

a.     Whether YouTube's acts and practices constitute unfair methods of competition;

b.     Whether YouTube engaged in unfair acts or practices in the conduct of trade;

c.     Whether YouTube engaged in deceptive business practices with respect to its handling of Adpocalypse;

d.     Whether YouTube made material misrepresentations and omissions with respect to the terms by which Plaintiffs and Class members were agreeing to become content providers;

e.     YouTube's motives for devising and executing its modification of Class members' content provider monetization structures;

f.     Whether and to what extent YouTube profited from its modification of Class members' content provider monetization structures;

g.     Whether YouTube violated Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

h.     Whether YouTube's conduct constitutes tortious interference with contractual relations and/or prospective economic advantage;

i.     Whether YouTube's conduct constitutes a breach of quasi contract;

j.     Whether YouTube's conduct constitutes a breach of contract;

k.     Whether Plaintiffs and Class members are entitled to equitable relief;

13

l.        Whether YouTube's unlawful, unfair, and deceptive practices harmed Plaintiffs and Class members;

m.     Whether YouTube's conduct is substantially injurious to content providers;

n.      The method of calculation and extent of damages for Plaintiffs and Class members;

o.      Whether Plaintiffs and the Class are entitled to restitution and, if so, in what amount; and

p.      Whether Plaintiffs and the Class are entitled to other appropriate equitable relief.

60.     <u>Typicality</u>. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all Class members, provided content on YouTube.com, and were negatively economically impacted by YouTube's unilateral and secretive changes to the monetization structure and AdSense algorithms, resulting in a reduction in marketing revenue. Each Class member's claims arise from the same tortious conduct of YouTube.

61.     <u>Adequacy</u>. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests do not conflict with the interests of Class members, and they have retained counsel experienced in prosecuting class action and consumer protection litigation.

62.     In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3).

63.     <u>Superiority</u>. A class action is superior to individual adjudications of this controversy. Litigation is not economically feasible for individual Class members because the amount of monetary relief available to individual plaintiffs is insufficient in the absence of the class action procedure. Separate litigation could yield inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system. A class action presents fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

64.     Class certification also is appropriate under Rule 23(b)(1) or (b)(2) because:

a.       the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for YouTube;

b.       the prosecution of separate actions by individual Class members would create a risk of adjudication of their rights that, as a practical matter, would be dispositive of the interests of other Class members not parties to such adjudications or would substantially impair or impede other Class members' ability to protect their interests; and

c.       YouTube has acted and refused to act on grounds that apply generally to the Class such that final injunctive relief or declaratory relief is warranted with respect to the Class as a whole.

### FIRST CLAIM FOR RELIEF
**Unfair and Unlawful Business Practices in Violation of the Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200,** *et seq.*
**(On Behalf of the Class)**

65.    Plaintiffs incorporate the above allegations by reference.

66.    YouTube's conduct resulted from policies that YouTube contrived, ratified, and implemented in California.

67.    YouTube's conduct is unlawful, in violation of the UCL, because it contravenes the legislatively declared policy against unfair methods of business competition. Additionally, YouTube's conduct is unlawful because, as set forth below, it violates California Contract Law principles, including breach of contract, breach of quasi-contract, breach of good faith and fair dealing, common law fraud and tortious interference with contractual relations and/or prospective economic advantage.

68.    YouTube engaged in unfair methods of competition and unfair trade practices that violate the UCL in at least the following respects:

a.       With the intent and effect of stifling open and vigorous competition in the market for content providers, YouTube devised and executed a material change to its advertising terms and AdSense practices, without providing any notice, either before during or after, in any conspicuous manner, to Plaintiffs or other content providers.

b.      YouTube intentionally caused Adpocalypse to occur, in an effort to appease its advertising partners, at the expense of its content providers.

c.      YouTube conditioned the operation of content providers on their adherence to YouTube's non-transparent advertising practices and policies, including the AdSense algorithm and content ratings system.

d.      By forcing Plaintiffs and Class members to adhere to these undisclosed practices, and forcing YouTube's policies on content providers, YouTube has obtained an unfair advantage in the marketplace and has hindered competition for content providers.

e.      YouTube has caused considerable harm to Plaintiffs and thousands of other content providers' businesses by imposing its policies on content providers.

69.      YouTube acted to inhibit competition in a manner that is unfair and substantially injurious to the consuming public. YouTube's unfair methods of competition and unfair acts and practices are contrary to California law and policy and constitute unscrupulous, unethical, outrageous, and oppressive business practices.

70.      YouTube has indicated that it considers itself free to commit similar injurious acts of unfair competition in the future. It should be enjoined from doing so pursuant to Business and Professions Code section 17203.

71.      The gravity of the harm resulting from YouTube's conduct detailed above outweighs any possible utility of this conduct. There are reasonably available alternatives that would further YouTube's legitimate business interests, such as disclosing the AdSense target areas and related policies and practices to content providers rather than maintaining them in secrecy.

72.      Plaintiffs and Class members could not have reasonably avoided injury from YouTube's unfair business conduct. Plaintiffs and Class members did not know, and had no reasonable means of learning, that YouTube would unilaterally alter the terms of its marketing program, compensation structure, or AdSense algorithms in advance of having done so.

73.      As a direct and proximate result of YouTube's conduct, Plaintiffs and Class members have suffered injuries in fact, including because:

a.     Plaintiffs and Class members depend on their ability to receive compensation from YouTube through its marketing program, and depend on the anticipated revenues to be generated therefrom based on historic rate stemming from the organic response of the population to the content they post on YouTube; however YouTube's unfair methods of competition and unfair acts and practices have thwarted and deprived them of the anticipated regular revenues stemming from the creation and posting of content on YouTube.com.

b.     YouTube's unfair methods of competition and unfair acts and practices have prevented Plaintiffs and Class members from making content creation and other business decisions on the basis of competitive factors in the marketplace.

c.     YouTube's unfair methods of competition and unfair acts and practices have caused Plaintiffs and Class members to incur lost time and out-of-pocket costs for, among other things, attempting to create new content that would be viewed as more favorable by AdSense; however doing so presented considerable challenges since Plaintiffs and other content providers had no realistic expectation of what AdSense was screening for.

d.     YouTube's unfair methods of competition and unfair acts and practices have prevented Plaintiffs and Class members, who had already created and posted content, and who would otherwise have continued to create and post content going forward, from learning about the basis for YouTube's monetization structure in its content provider marketing terms, and in contravention of the Plaintiffs' and Class members' reasonable expectations and practices.

e.     As a result of YouTube's unfair methods of competition and unfair acts and practices, Plaintiffs and Class members lost value to their businesses, as well as advertising revenues.

f.     YouTube's unfair methods of competition and unfair acts and practices have caused Plaintiffs' and Class members' content and YouTube Channels, as well as related business dealings to suffer a loss in value.

74.     All of YouTube's unlawful and unfair conduct occurred during YouTube's business and was part of a generalized course of conduct. YouTube's decisions relating to the conduct alleged herein originated in YouTube's operations within the State of California.

75.     Plaintiffs and the Class accordingly are entitled to relief as provided for under the UCL, including restitution, declaratory relief, and a permanent injunction prohibiting YouTube from committing these violations and requiring YouTube to reverse its unfair and unlawful policies, including by being transparent with its content providers about the terms of their compensation structures.  Plaintiffs also respectfully seek reasonable attorneys' fees and costs under applicable law, including California Code of Civil Procedure section 1021.5.

**SECOND CLAIM FOR RELIEF**
**Fraudulent Business Practices in Violation of the Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of the Class)**

76.     Plaintiffs incorporate the above allegations by reference.

77.     YouTube's conduct resulted from policies that YouTube contrived, ratified, and implemented in California.

78.     YouTube's conduct violates the UCL's prohibition of fraudulent business practices.

79.     To induce the posting of content on YouTube.com, which in turn led to advertising partners to contract with YouTube, YouTube provided a monetization structure to members of the public interested in becoming content providers.  YouTube provided very little information to content providers about the structure of how they would be compensated under the monetization schedule, but did historically provide fair compensation to content providers in exchange for the revenue generated as a result of the artistic and creative work they created and posted on YouTube.com. Historically, content providers came to expect a certain return on investment in dealing with YouTube under this structure, which remained steady and predictable.  Plaintiffs relied on the fact that historically they could expect a certain return on investment to the content they created, as described above.

80.     In March of 2017, YouTube implemented new terms and conditions to the arrangement, including by implementing new AdSense algorithms that targeted and demonetized certain types of content.  YouTube never explained to content providers that it would be doing this, or that it did do this.  YouTube did this for personal gain, i.e. to prevent advertising partners from

leaving YouTube; however the result was severely detrimental to content providers, including Plaintiffs.

81.     YouTube also implemented a secret ratings system, which was secretly formulated through automated means using AdSense, or similar related technology, and which placed a rating on each video posted by a content provider.  Advertisers could then use this rating system to screen certain ratings of videos from the types of videos on which they desired their advertisements to be placed, or not placed.  YouTube never disclosed that it was implementing this practice to content providers.

82.     Content providers relied detrimentally on the status quo being preserved, in creating new content at their expense, and posting it to YouTube.com

83.     YouTube benefitted from the creation of this content and the placement of it on YouTube's website, because the content continued to drive consumers to YouTube for viewing purposes; however, YouTube stopped compensating its content providers at the same historic rates, as a result of the new practices that it never disclosed to content providers.

84.     Plaintiffs' allege these acts be constitute both fraud by omission and fraud by misstatement.

85.     A reasonable content provider would have been misled by YouTube's conduct

86.     YouTube's conduct had a strong tendency and likelihood to deceive reasonable content providers.  YouTube's conduct misled, deceived, and tricked Plaintiffs and Class members into placing content on YouTube, expecting one rate of compensation, while YouTube engaged in activity that was undisclosed which led them to receive a much lower rate of compensation.

87.     YouTube's conduct constitutes a bait and switch scheme.

88.     YouTube had a duty to clearly and conspicuously disclose to Plaintiffs and Class members all of the material terms of its monetization structure, and the algorithms by which AdSense was selecting content to be monetized or demonetized, so that content providers could make informed business decisions about the types of creative content they created for YouTube.

89.     YouTube breached its duty to disclose by concealing its AdSense algorithms and its decision to alter its monetization structure from content providers

CLASS ACTION COMPLAINT

90.     YouTube caused Plaintiffs and Class members to forgo creating other forms of content, in reliance on their belief that they would continue to receive similar revenues for similar public response to their content; yet YouTube concealed material facts that were pertinent to their decisions.

91.     Plaintiffs and the Class accordingly are entitled to relief as provided for under the UCL, including restitution, declaratory relief, and a permanent injunction. Plaintiffs also respectfully seek reasonable attorneys' fees and costs under applicable law, including California Code of Civil Procedure section 1021.5.

### THIRD CLAIM FOR RELIEF
**Tortious Interference with Contractual Relations and/or Prospective Economic Advantage**
**(On Behalf of the Class)**

92.     Plaintiffs incorporate the above allegations by reference.

93.     At the time YouTube unilaterally altered the terms of its monetization structure for content providers, Plaintiffs and Class members had entered into business transactions with third-party advertisers, purchasers, and other businesses, which were premised in large part off of Plaintiffs' and Class Members' ability to monetize their content and receive both advertising revenue and views on YouTube.  These sales transactions involved various contractual conditions of sale.

94.     For instance, Plaintiffs were negotiating a contract with a third party who wanted to purchase the rights to own and monetize their YouTube videos.  After Adpocalypse, the value of Plaintiffs' channel plummeted, because predicting future advertising revenue through YouTube's monetization schedule became highly challenging since YouTube took it upon itself to change the rules of monetization without notice, and to the detriment of its content providers.

95.     YouTube was aware that Plaintiffs and Class members routinely enter into such related contracts with third parties, and that changes to its monetization structure, including demonetizing videos without notice or recourse, and altering the terms by which videos would receive compensation would have a direct impact on these contractual arrangements.

96.     Plaintiffs had multiple contractual deals fall through or devalued as a direct attributable result of YouTube's aforementioned conduct.

97.     YouTube's interference with the contractual conditions of sale between Plaintiffs and Class members, on one hand, and third-party marketers and investors, on the other hand, was intentional and wrongful.

98.     YouTube's interference with Plaintiffs and Class members' reasonable expectation that they could negotiate contracts with third-party marketers and investors, was intentional and wrongful.

99.     Plaintiffs and Class members sustained harm as a direct and proximate result of YouTube's tortious interference with contractual relations and/or prospective economic advantage. Plaintiffs and Class members accordingly seek damages in an amount to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**Breach of Contract**
**(On Behalf of the Class)**

100.     Plaintiffs include by reference all previous paragraphs as if set forth herein.

101.     A contract existed between Plaintiffs and Class members and Defendant , which governed the terms and conditions by which Plaintiffs were permitted to engage with YouTube as a content provider.  Similarly a contract existed between Plaintiffs and Class members and Defendant which governed Plaintiffs' monetization structure for the posting of their content on YouTube

102.     By altering the terms and conditions governing how Plaintiffs' and Class members' videos would be monetized, Defendant breached said contract.

103.     Plaintiffs and Class members performed all obligations arising from the contract.

104.     As a result, Plaintiffs and Class members suffered harm.

105.     Therefore, Defendant is liable to Plaintiffs and Class members accordingly seek damages for their breach of the contract as described herein, thus entitling Plaintiffs to recompense.

**FIFTH CLAIM FOR RELIEF**
**Breach of Duty of Good Faith And Fair Dealing**
**(On Behalf of the Class)**

106.     Plaintiffs include by reference all previous paragraphs as if set forth herein.

107.     All parties to a contract are obliged to refrain preventing one another from receiving the reasonably expected benefits of the contract.  To make out a claim for a violation of this duty, Plaintiffs must show the following: 1) there was a contract between Plaintiffs and Defendant; 2)

Plaintiffs performed their obligation or was relieved therefrom; 3) Defendant unfairly prevented Plaintiffs from receiving the benefits of the contract; and 4) as a result, Plaintiffs were harmed.

108.   Plaintiffs were engaged in a contractual relationship with Defendant, namely for the exchange of valuable consideration for the provision of content on YouTube.com.

109.   Plaintiffs performed all obligations arising out of the contract and in no way interfered with Defendant's ability to perform their own.

110.   By engaging in the conduct herein described, Defendant unfairly prevented Plaintiffs from receiving the benefits of the contract.

111.   The same is true for Class Members

112.   As a result, Plaintiffs and Class Members have suffered economic harm, stress and anxiety, and inconvenience.

113.   Defendant is therefore liable to Plaintiffs and Class Members for their violation of their duty of good faith and fair dealing, and Plaintiffs and Class Members are therefore entitled to recovery of all damages, both economic and non-economic, and all other remedies the court deems appropriate.

### SIXTH CLAIM FOR RELIEF
**Breach of Quasi Contract**
**(On Behalf of the Class)**

114.   Plaintiffs incorporate by reference each allegation set forth above.

115.   As a direct and proximate result of its acts, as set forth above, Defendant has been unjustly enriched.

116.   Through unlawful and deceptive conduct in connection with the terms governing monetization of content providers, and the algorithms used by its applications such as Adsense to select content for demonetization, YouTube has reaped the benefits of Plaintiff's and Class Members' creation and posting of content on YouTube.com, and related participation in the YouTube community.

117.   YouTube's conduct created a contract or quasi-contract through which YouTube received and continues to receive a benefit of monetary compensation without providing the

consideration promised to Plaintiff and Class Members. Accordingly, YouTube will be unjustly enriched unless ordered to disgorge those profits for the benefit of Plaintiff and Class Members.

118. Plaintiff and Class Members are entitled to and seek through this action restitution of, disgorgement of, and the imposition of a constructive trust upon all profits, benefits, and compensation obtained by YouTube from its improper conduct as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class defined above, respectfully request that this Court:

A. Certify this case as a class action under Federal Rule of Civil Procedure 23, appoint Plaintiffs as Class representatives, and appoint the undersigned counsel as Class counsel;

B. Enter injunctive and declaratory relief as appropriate under applicable law;

C. Order restitution or actual damages to Plaintiffs and Class members;

D. Award Plaintiffs and Class members trebled damages along with pre- and post-judgment interest, as prescribed by law;

E. Award punitive damages, as permitted by law, in an amount to be determined by the jury or the Court;

F. Order YouTube to provide notice to the Class of this action and the remedies entered by this Court;

G. Award reasonable attorneys' fees and costs as permitted by law; and

H. Enter such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues so triable.

///
///
///

CLASS ACTION COMPLAINT

1  Dated: October 26, 2017

Respectfully submitted,

By: /s/ *Todd M. Friedman*

Todd M. Friedman (State Bar No. 216752)
Adrian R. Bacon (State Bar No. 280332)
**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
21550 Oxnard St., Suite 780
Woodland Hills, California 91367
Telephone: (877) 206-4741
Facsimile:  (866) 633-0228
*tfriedman@toddflaw.com*
*abacon@toddflaw.com*

CLASS ACTION COMPLAINT

CERTIFICATE OF SERVICE

Filed electronically on this 26th day of October, 2017, with:

United States District Court CM/ECF system
Notification sent electronically on this 26th day of October, 2017, to:

Honorable Judge Edward M. Chen
United States District Court
Northern District of California

And all counsel of record


s/Todd M. Friedman
Todd M. Friedman