Todd M. Friedman, Esq. (216752)
Adrian R. Bacon, Esq. (280332)
**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
21550 Oxnard Street, Suite 780
Woodland Hills, CA 91367
Telephone: (877) 206-4741
Facsimile: (866) 633-0228
tfriedman@toddflaw.com
abacon@toddflaw.com
*Attorneys for Plaintiff,*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES SWEET; CHUCK MERE; ZOMBIE GO BOOM, LLC, DBA ZOMBIEGOBOOM, <br><br> Plaintiff, <br><br> v. <br><br> GOOGLE, LLC; YOUTUBE, LLC; and DOES 1-10, inclusive , <br><br> Defendant. | **Case No.:** 3:17-cv-03953-EMC <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** <br><br> Hearing Date:  March 1, 2018 <br> Hearing Time:  1:30 p.m. <br> Courtroom:       5 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................1

II. SUMMARY OF ALLEGATIONS..............................................................3

  A. Defendant's sudden decision to unilaterally and arbitrarily change the monetization policy for content creators..........................................................3

    1. Defendants' conduct constituted a breach of contract............................5

    2. Defendants' conduct constituted a breach of the implied covenant of good faith and fair dealing ...............................................................6

    3. Defendants' conduct constituted a breach of quasi-contract ..................6

    4. Defendants' actions interfere with Plaintiffs' economic advantage.........7

    5. Defendants' actions are harmful to healthy competition.........................7

III. LEGAL STANDARD ...........................................................................8

IV. LEGAL ARGUMENT...........................................................................9

  A. The YouTube Partnership Program Terms Do Not Bar This Case...........9

    1. The Disclaimer In The Partner Program Terms Is Either Unconscionable Or Renders The Terms Otherwise Illusory.....................10

    2. California Law Holds That Plaintiff's Good Faith And Fair Dealing Claim Is The Only Thing That Could Potentially Save The Partner Program Terms From Being Illusory ................................................15

  B. Section 230(c) Of The CDA Does Not Bar Plaintiffs' Claims...................17

  C. Plaintiffs Have Asserted Sufficient Facts For A Determination Based On Theories Of Contract And Tort Law..........................................................19

    1. Breach of Contract...........................................................................19

    2. Breach of Implied Covenant of Good Faith .........................................20

**3. Breach of Quasi-Contract** ................................................................**21**

**4. Tortious Interference** ......................................................................**22**

**5. Plaintiffs Have Properly Pled A Cognizable UCL Theory** ....................**23**

**V. CONCLUSION** ........................................................................................**25**

### TABLE OF AUTHORITIES

**Cases**

*24 Hour Fitness, Inc. v. Superior Court*, 66 Cal.App.4th 1199 (1998)...................14

*Abbit v. ING USA Annuity & Life Ins. Co.*, 252 F. Supp. 3d 999 (S.D. Cal. 2017)...........................................................................................20, 21

*Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079 (9th Cir. 2005)...........................22

*Asmus v. Pacific Bell*, 23 Cal.4th 1, 16 (2000) ..................................................13, 16

*Baltazar v. Forever 21, Inc.*, 62 Cal.4th 1237 (2016) ............................................11

*Casas v. Carmax Auto Superstores California LLC,* 224 Cal.App.4th 1233 (2014)..............................................................................................13

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527 (1999) 23, 25

*Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916 (9th Cir. 2013).......................14, 16

*Circuit City Stores, Inc. v. Adams*, 279 F.3d 889 (9th Cir. 2002) ....................11, 12

*Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017 (N.D. Cal. 2012)..............................24

*Everest & Jennings, Inc. v. American Motorists Ins. Co.*, 23 F.3d 226 (9th Cir.1994)................................................................................................9

*Federal Trade Commission v. LeadClick Media, LLC*, 838 F.3d 158 (2nd Cir. 2016)..............................................................................................19

*Flores v. Am. Seafoods Co.*, 335 F.3d 904 (9th Cir. 2003) ...................................13

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119 (9th Cir. 2014) 22

*Goddard v. Google, Inc.*, No. C 08–2738 JF (PVT), 2008 WL 5245490 (N.D.Cal. Dec. 17, 2008) ..............................................................................18

*Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807 (1981) ............................................13

*Ingle v. Circuit City Stores, Inc.,* 328 F.3d 1165 (9th Cir.2003)..............12, 14, 16

*Int'l Bus. Machines Corp. v. Bajorek*, 191 F.3d 1033 (9th Cir. 1999) ..................11

*Klussman v. Cross Country Bank*, 134 Cal.App.4th 1283 (2005)..........................11

*Little v. Auto Stiegler, Inc.*, 29 Cal.4th 1064 (2003)..............................................12

*McKell v. Wash. Mut., Inc.*, 49 Cal. Rptr. 3d 227 (Ct. App. 2006) ........................23

*Mohamed v. Uber Technologies, Inc.*, 109 F.Supp.3d 1185 (N.D. Cal. June 9, 2015).................................................................................................................14

*Monex Deposit Co. v. Gilliam*, 680 F. Supp. 2d 1148 (C.D. Cal. 2010)................22

*N.L. Indus., Inc. v. Kaplan*, 792 F.2d 896 (9th Cir. 1986)..........................................8

*Nat'l Numismatic Cert., LLC v. eBay, Inc.*, No. 6:08–cv–42–Orl–19GJK, 2008 WL 2704404 (M.D.Fla. July 8, 2008) ...............................................................18

*Net Glob. Mktg., Inc. v. Dialtone, Inc.*, 217 Fed.Appx. 598 (9th Cir. 2007).....14, 16

*O'Connor v. Uber Technologies, Inc.*, 150 F.Supp.3d 1095 (N.D. Cal. 2015) .......14

*Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480 (9th Cir. 1995) ........................8

*Perdue v. Crocker National Bank*, 38 Cal.3d 913 (1985) ......................................12

*Pinnacle Museum Tower Assn. v. Pinnacle Market Development*, 55 Cal.4th 223 (2012)..........................................................................................................12

*Poublon v. Robinson Co.*, No. 2:12–CV–06654–CAS MA, 2015 WL 588515 (C.D. Cal. Jan. 12, 2015) ...............................................................................14

*Progressive W. Ins. Co. v. Yolo Cty. Super. Ct.*, 37 Cal. Rptr. 3d 434 (2005)........23

*Raymat Materials, Inc. v. A & C CATALYSTS, INC.*, No. C 13-00567 WHA, 2013 WL 3662477 (N.D. Cal. July 12, 2013) ...........................................................20

*Ridgeway v. Nabors Completion & Production Services Co.*, 139 F.Supp.3d 1084 (C.D. Cal. 2015) ...............................................................................14, 16

*Schnuerle v. Insight Communications Co.*, 376 S.W.3d 561 (Ky. 2012)...............13

*Serpa v. Cal. Sur. Investigations, Inc.*, 215 Cal.App.4th 695 (2013)..........13, 15, 16

*Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876 (N.D. Cal. 2015).......................18

*Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal.4th 1109 (2013)..................................13

*South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal.App.4th 861 (1999)..........................................................................................................24

*Sparks and Macias v. Excel Bldg. Servs. LLC*, 767 F.Supp.2d 1002 (N.D.Cal.2011) ...............................................................................................14

*Sparks v. Vista Del Mar Child & Family Servs.*, 207 Cal.App.4th 1511 (2012) ....14

*Stirlen v. Supercuts, Inc.*, 51 Cal.App.4th 1519 (1997)............................................12

*Telecom Asset Mgmt., LLC v. Fiberlight, LLC*, 203 F. Supp. 3d 1013 (N.D. Cal. 2016)................................................................................................................21, 22

*Trivedi v. Curexo Technology Corp.*, 189 Cal.App.4th 387 (2010) ........................11

**Statutes**

Communications Decency Act (CDA), 47 *U.S.C.* 230(c) ................................17, 19

**Other Authorities**

8 Williston on Contracts (4th ed. 2010) § 18.10, p. 91 ...........................................13

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

The case at bar concerns Defendants GOOGLE, LLC's, and YOUTUBE, LLC's (collectively referred to as "Defendants" or "YouTube") arbitrary, secretive, and unfair practice of changing its monetization policies for content uploaded to YouTube.com.  Plaintiffs James Sweet, Chuck Mere, and Zombie Go Boom, LLC DBA Zombiegoboom ("Plaintiffs") allege in great detail and specificity how, when, where, what, and why Defendants engaged in pulling the rug out from underneath Plaintiffs and other content creators by arbitrarily and secretively implementing a new monetization system without advanced notice or agreement, thereby causing Plaintiffs and other content creators to experience a precipitous crash in income.  What is shocking about the facts of this case is that content providers, like Plaintiffs, are business partners with Defendants, engaged in a long term contractual arrangement, whereby their livelihoods are completely governed by the terms of YouTube's monetization schedule, and yet YouTube gave absolutely no advanced notice or transparency whatsoever to any of the content providers who support the YouTube platform, before unilaterally changing the methods by which their content would be monetized.[1]  This included not just future content, but content that had already been created and posted to YouTube, as well as content that was in production.[2]  The terms of monetization are kept completely secret by YouTube, and not meaningfully shared with content providers, despite this being the lifeblood and primary stream of income for those like Plaintiffs.  Content providers have no idea before they undertake the effort of making content if it will even meet YouTube's guidelines for monetization

---

[1] Imagine if a movie theater chain did this to 21st Century Fox, if Walmart did this Samsung, or if a law firm did this to one of its partners.

[2] It is factually critical here that YouTube was not <u>removing</u> content from its site during *Adpocalypse*, but rather simply <u>deciding not to place advertisements on certain videos that were posted to its site</u> (demonetizing videos).

---

because YouTube doesn't reveal how it makes such decisions.

This lack of transparency and unilateral control exercised in bad faith under cover of night is the crux of the case. Plaintiffs lost their livelihoods because YouTube made a decision to alter the way things historically were done and demonetize all of their videos without notice, explanation, input, or recourse.[3] Simply put, Plaintiffs are alleging that it is unfair, inequitable, and frankly absurd that YouTube can make such earth-shattering changes to the most important part of their relationship as the ones made during *Adpocalypse* without even telling their business partners what is going on. That is not what the reservation of rights envisions, and if it is, it's an unconscionable term that makes the contract illusory and should be severed. If this was done in the context of any other business arrangement, that business would be publically excoriated. The fact that this is on the Internet should not change anything and neither should the vague reservation of rights clause in the Partner Program Terms that Google relies so heavily upon. Moreover, this case has nothing whatsoever to do with censorship. It is about engaging in good faith and transparency with those whom one does business.[4]

While Defendant's Motion ignores and misconstrues Plaintiffs' actual allegations, Plaintiffs in fact allege that Defendants' swift, secretive, and arbitrary restructuring of the monetization policy and AdSense algorithms harmed not only Plaintiffs, but all content creators who regularly upload content to YouTube.com. Thus, the drastic overhaul of Defendants' monetization practices for content uploaded to YouTube.com constitutes a breach on several contract theories.

Plaintiffs, even after filing the original complaint, are still subjected to

---

[3] The situation is reminiscent of the classic Darth Vader Line from The Empire Strikes Back: "I am altering the deal. Pray I don't alter it any further."

[4] Defendants hope to buck this lawsuit by relying on the Communications Decency Act, but misconstrue the facts of the case to make this argument. Plaintiffs' videos were not censored. They were demonetized. Plaintiffs could post their content on YouTube, but they no longer are getting paid for it, because Google is engaging in bad faith as to the terms by which content providers are eligible to receive payment.

---

harmful effects from Defendant's breach through their unilateral decision to arbitrary change the monetization policy under the terms and conditions. Plaintiffs continue to see a massive decline in revenue due to the demonetizing of its newer content, leading to the very real prospect that their channel may shut down.[5] Concurrent with the loss in revenue, the recent monetization changes caused Plaintiffs to lose additional revenue from advertisers, independent of Defendants, and to lose an offer for the total purchase of their business.  In totality, Defendants actions amount to three distinct violations of law: 1) a breach of contract, quasi contract, and/or good faith and fair dealing because of the decision to substantially change the methods of monetization; 2) consequently interfering with Plaintiffs' economic advantages by causing the cancellation of Plaintiffs' additional avenues of revenue and offers tendered for their hard work; and 3) finally, the mere act of unilaterally and drastically changing the terms of the monetization policy constituted an unfair act and unfair competition.  As set forth in greater detail below, Plaintiffs respectfully request that this Honorable Court deny Defendant's Motion in full or at least grant Plaintiffs leave to amend the complaint.

## II.   SUMMARY OF ALLEGATIONS

Defendant's Summary of Allegations either misstates or leaves out several critical factual allegations as pled in Plaintiffs' Amended Complaint.  Plaintiffs offer this supplemental Summary of Allegations, for the Court's consideration.

### A. Defendant's sudden decision to unilaterally and arbitrarily change the monetization policy for content creators.

As an initial point, Defendant has critically misstated Plaintiffs' allegations regarding the events leading to their breach of contract.  It must be recognized that Plaintiffs do not allege that Defendant does not perform under the contract.  Rather,

---

[5] Without getting too personal, Plaintiffs went from having a thriving business employing four families, to being temporarily homeless over the holidays because of YouTube's acts.  YouTube's "we can do whatever we want" approach to this litigation is heartless and tone deaf to the legal and factual issues present in the case.

the crux of Plaintiffs' claims is the sudden unilateral and arbitrary modification in the monetization policy that caused massive demonetization for many content producers.  Plaintiffs filed the Complaint on or about July 13, 2017, after suffering harm from Defendants' arbitrary and deceptive modification of their monetization policy, since the advent of "*Adpocalypse*" in or around March, 2017.  Dkt. No. 1. Plaintiffs' Complaint was premised on the fact that a large community of content creators, who regularly uploaded video content to YouTube, suffered massive financial losses due to the sudden and secretive implementation of Defendant's revised monetization policies, known as *Adpocalypse*.  Dkt. 13 ¶¶ 4-5, 7, 19-54.

On or about March of 2017, Defendant unilaterally and secretively rewrote their monetization policies and algorithms, assented to by anyone who uploads content to YouTube, after facing backlash from third party advertisers for the monetization of a graphic and obviously objectionable video.  Dkt. 13 ¶¶ 5, 28-30. Third party advertisers pay Defendants to advertise their products and services on Plaintiffs' and other content producers' videos.  Under the monetization policy, Plaintiffs earn a percentage of revenue based on the amount of views the content accrues. Dkt. 13 ¶¶ 2, 19, 22.  While the structure of payment remained the same, the methods by which content would be monetized were dramatically revised unilaterally by YouTube.   The creation and implementation of this new monetization policy occurred secretively and without any input from the content producers, advanced notice, or recourse.  Dkt. 13 ¶¶ 5, 29-30, 33, 36-38.  Moreover, Defendants showed complete lack of transparency by implementing this new policy without any notice, and after its implementation, only provided vague and useless information to the many questions of the content producers. Dkt. 13 ¶¶ 33, 36-38.

Since the implementation of the new monetization policy and new AdSense algorithms, Plaintiffs experienced a precipitous decline in revenue, through the demonetizations of their content, due to the numerous problems and inconsistent application of the new policies.  *Id*. ¶¶ 6-7, 32, 34, 45-46.  Defendants remained

dismissive and unhelpful when Plaintiffs attempted to reach out and seek clarification or appeal the decision to demonetize. *Id*. ¶¶ 49-50. Plaintiffs suffered extraordinary damages with the loss of approximately 95% of their revenue due to the new demonetization practices. *Id*. ¶ 32. Other losses included loss of revenue from other advertising channels as well the rescission of an offer to purchase all of Plaintiffs' content and YouTube channel for $60,000. *Id*. ¶¶ 45-46.

While Defendant did eventually publish guidelines for content providers to follow to avoid demonetization (after *Adpocalypse*, not before), these guidelines are not followed by YouTube's demonetization algorithms. Dkt. No. 30-3. Plaintiffs allege that their videos are not "otherwise objectionable," nor are they undesirable or offensive.[6] In fact, the demonetization algorithms implemented by YouTube in the advent of Adpocalypse frequently function in a manner that demonetizes content providers whose videos are not undesirable or offensive.[7] YouTube's demonetization algorithm does not effectively target only objectionable, undesirable, or offensive content. Plaintiffs assert that the demonetization of their content is not about YouTube's editorial discretion. Dkt. 13 at ¶ 40.

### 1. Defendants' conduct constituted a breach of contract

Plaintiffs allege that through the unilateral and arbitrary changing of material terms to the monetization policy, Defendants' breached their contracts with content providers. Dkt. 13 ¶ 102. When the terms were changed, Defendants gave no notice or information regarding the modification or its effects on content creators. Dkt. 13 ¶¶ 5-6, 36-39. Defendant and Plaintiffs have a successful longstanding relationship.

---

[6] YouTube tries to introduce facts into its Motion, which suggest it would like to dispute this allegation, but a motion to dismiss is not the time to do so.

[7] Plaintiffs cite to a video: https://www.youtube.com/watch?v=ppcYoem3URo, which Plaintiffs would respectfully request the Honorable Court to watch. It features the popular content provider "TheReportOfTheWeek" who has over half a million subscribers. He explains how he had a video demonetized for a "review for a burger" as having been objectionable based on YouTube's demonetization algorithm, and his subsequent frustration and confusion. Dkt. 13 ¶ 40.

Dkt. 13 ¶¶ 20-24, 27.  Plaintiffs allege that Defendant's sudden change in policy breached the agreement because Defendants acted unilaterally and arbitrarily, in deciding to change the most important terms (the payment of money) without any notice or consent by the opposite party.  Dkt. 13 ¶ 53.

### 2. Defendants' conduct constituted a breach of the implied covenant of good faith and fair dealing

Plaintiffs allege a breach in the covenant of good faith and fair dealing because Defendants unilateral, arbitrary, and secretive modified the monetization policy and established a proverbial brick wall to Plaintiffs' ability to profit off the content uploaded to their channel.  Dkt. 13 ¶¶ 108-110.  The implementation of the new demonetization policy was never explained to Plaintiffs in any meaningful way and was generally being misapplied per the very structure that YouTube provided to content providers.  YouTube abused the very provision in its Partnership Program Terms upon which it hinges its defense.[8]  Historically, Plaintiffs earned $10,000-$15,000 per month, with one million views translating to approximately $1,000-$2,000 in revenue.  Dkt. 13 ¶ 25.  After the changes, Plaintiffs would receive $20-$40 per day, with one million views translating to $150.  Dkt. No. 13 ¶ 32.  This precipitous drop occurred directly because of YouTube's new undisclosed demonetization practices.  Plaintiffs' current and future content are in danger of demonetization.  Dkt. 13 ¶¶ 30-32, 34.  Plaintiffs allege that Defendant's sudden actions, following the backlash they faced for monetizing a video with objectionable conduct, was in bad faith because the demonetization of their current content was not a decision that was envisioned in the Terms of the business arrangement, but rather were a direct result of YouTube's incompetence, self-interest, and overreaction.  Dkt. 13 ¶¶ 33, 36-38, 41-42, 48-49, 53.

///

### 3. Defendants' conduct constituted a breach of quasi-contract

---

[8] "YouTube is not obligated to display any advertisements alongside your videos and may determine the type and format of ads available on the YouTube Service."

1
2
3
4
5
6
7
8
9
10
11

Plaintiffs allege that, through the secretive and deceptive tactics, Defendant benefits and continues to receive benefits from Plaintiffs' content uploaded to YouTube.  Dkt. 13 ¶ 116.  YouTube makes money because advertisers pay for views.  Plaintiffs still draw consumers to YouTube, and those consumers will inevitably watch other monetized videos even though their content is demonetized.  YouTube is thus reaping benefits at Plaintiffs' expense, thereby circumventing the plain written terms of the contract.  The changes made to the monetization policy continue allowing Defendant to reap the benefits from the content uploaded on their website, while Plaintiffs and other content providers suffer losses, not only to their revenue from monetization, but also in valuable resources in order to continue creating their content.  Dkt. 13 ¶¶ 42, 48, 51.

12

### 4.  Defendants' actions interfere with Plaintiffs' economic advantage.

13
14
15
16
17
18
19
20
21
22

Plaintiffs suffered injury, by the loss of additional third party revenue and competitive offer to purchase their channel, due to Defendant's specific acts of implementing new demonetization procedures.  Dkt. 13 ¶¶ 45-46, 93-99.  This devalued Plaintiffs' brand name and the equity of their channel.  Plaintiffs allege that they received further revenue from their content through third party advertising of products within the uploaded content itself.  Dkt. 13 ¶ 45.  Moreover, Plaintiffs entertained an offer to sell their content and channel to a third party for $60,000.  Dkt. 13 ¶ 46.  Defendant's actions interfered with Plaintiffs' ability to continue generating revenue from their content due to the demonetization of their content reducing the value of Plaintiffs' content and channel.  Dkt. 13 ¶ 95-99.

23

### 5.  Defendants' actions are harmful to healthy competition.

24
25
26
27
28

Plaintiffs allege Defendant's sudden contractual overhaul inhibits the ability of Plaintiffs and other content providers from being able to properly profit from the products they produce.  Dkt. 13 ¶ 68.  This is in large part due to the fact that YouTube is the only game in town when it comes to publishing creative content of the nature created by Plaintiffs.  Since suffering public backlash from monetizing

graphic content and hate speech, Defendants unilaterally and materially altered their monetization policies over a very short period of time and without notice to content providers.  Dkt. 13 ¶¶ 28-30, 33.  These actions stifled the ability for content providers to continue uploading their products to YouTube and receive any benefits from the contract in doing so.  Dkt. 13 ¶¶ 32, 42.  Defendant forced content providers, such as Plaintiffs, to comply with translucent policies and regulations, essentially, acting as the gatekeeper ensuring that the advertisers are appeased but giving no credence to the content providers.  Dkt. 13 ¶¶ 29, 33, 42.

Plaintiffs allege that the aforementioned acts cost them tens if not hundreds of thousands of dollars, are ongoing, and seek monetary damages, class certification, and perhaps most importantly, a "Court order mandating that YouTube make its revenue sharing rules, including both the demonetization/monetization qualifications and programming, and the structure by which content providers are paid a share of advertising revenue generated from their content, available in complete form to content providers at the time that they first contract with YouTube to provide such services to YouTube."  Dkt. No. 13 ¶ 54.

### III.   LEGAL STANDARD

A motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of the claims in the complaint.  The court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them, and must construe the complaint in the light most favorable to plaintiffs.[9]  *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995); *N.L. Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).  A complaint should not be dismissed unless a plaintiff could prove no set of facts in support of his claim that would entitle him to relief, and amendment would be futile.

---

[9] Plaintiffs will agree to voluntarily drop their claims under the UCL's fraudulent prong, preserving their other two UCL theories of liability.  Accordingly, Rule 9 is not implicated by any of the causes of action, and the Motion to Dismiss should be solely analyzed under Rule 12(b)(6).

*Everest & Jennings, Inc. v. American Motorists Ins. Co.*, 23 F.3d 226, 228 (9th Cir.1994).

IV.   **LEGAL ARGUMENT**

   A. **The YouTube Partnership Program Terms Do Not Bar This Case**

   YouTube hinges their hopes of skirting this lawsuit on a an argument that its Partner Program Terms allow YouTube unilateral and unfettered discretion to decide which videos to monetize.  However, YouTube has placed itself squarely in a Catch 22 by raising this argument, based on binding California precedent. Plaintiffs have alleged in great detail how they spent several years posting videos of the same nature as they posted after *Adpocalypse*, and receiving a steady stream of revenue from YouTube due to all of their videos being uniformly monetized. Until one day, YouTube decided to change everything and cause the *Adpocalypse*, and the utter ruination of Plaintiffs' business, without notice, input, or recourse. Plaintiffs allege that the only thing that changed in March 2017 was that YouTube overreacted to some bad press, and instituted new ineffective algorithms that both overinclusively and underinclusively failed to accomplish the goal of preventing ISIS videos from having Pepsi ads show up at the beginning of the videos.[10]

   Defendants argue that the following provision in the Partner Program Terms legally prevent Plaintiffs from bringing a case against YouTube for implementing an alleged unfair and arbitrary demonetization algorithm:

   **Monetization Revenues.** YouTube will pay you as follows:
   Advertising Revenues. YouTube will pay you 55% of net revenues recognized by YouTube from ads displayed or streamed by YouTube or an authorized third party on your Content watch pages or in or on the YouTube video player in conjunction with the streaming of your Content. YouTube is not obligated to display any advertisements alongside your videos and may determine the type and format of ads available on the YouTube Service.

(emphasis added).  The problem with Defendants' position is that the highlighted

---

[10] One example of how the algorithms are still failing is the recent monetized Logan Paul video, where the popular YouTube star posted himself next to a dead body.

language renders the provisions completely illusory and unconscionable if it is not carried out with an even hand, with transparency, and in good faith.

As an illustrative analogy, imagine an industrious partner at a law firm had a contract whereby she would receive 55% of all fees that she earned on cases that she served as lead counsel.  Imagine the attorney's compensation contract stated "Attorney agrees that in addition to working as the lead counsel on cases, Attorney will, subject to the discretion of the Managing Partner, be required to assist with other cases for the Firm and perform administrative work for the general benefit of the Firm.  Firm does not guarantee and is not obligated to assign any cases to Attorney or appoint Attorney as lead counsel on any cases."  Now imagine the Attorney has been working for the Firm for 5 years, and generally during that time spends 90% of her time working as lead counsel on cases, thereby earning a very good living.  But, in March 2017, the Firm implements a new method of assigning work to its staff, that results in the Attorney now spending 95% of her time on administrative work and assisting on other attorneys' cases, resulting in a compensation reduction of 95%.  That attorney would certainly be permitted to raise a grievance that the disclaimer was no longer being applied in good faith.  This is what YouTube has done to Plaintiffs.  Either the disclaimer is unconscionable and severable, the contract is illusory, or Defendants have breached their covenant of good faith and fair dealing.  YouTube wants to have its cake and eat it too, but unfortunately that is not how California Contract Law works.  Binding precedent, and decisions issued by This Honorable Court have held that such provisions do not bar suit.  The breach of good faith and fair dealing requirement is implicated, as is unconscionability and illusory contract principles under these circumstances.

1. **The Disclaimer In The Partner Program Terms Is Either Unconscionable Or Renders The Terms Otherwise Illusory**

California has a substantial interest in applying its law of unconscionability to the enforcement of a Contract.  *See Int'l Bus. Machines Corp. v. Bajorek*, 191

F.3d 1033, 1042 (9th Cir. 1999); *Klussman v. Cross Country Bank*, 134 Cal.App.4th 1283, 1295-96 (2005).   Under California's Unconscionability Doctrine, an agreement is rendered unconscionable if the agreement is procedurally unconscionable and substantively unconscionable.  *See Baltazar v. Forever 21, Inc*., 62 Cal.4th 1237, 1243 (2016).  As the California Supreme Court has stated:

> The prevailing view is that procedural and substantive unconscionability must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability. But they need not be present in the same degree. Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves. In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.

*Id.  See also Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 893 (9th Cir. 2002). "[P]rocedural unconscionability [ ] consider[s] the equilibrium of bargaining power between the parties and the extent to which the contract clearly discloses its terms." *Id*.  "[S]ubstantive unconscionability ... involves whether the terms of the contract are unduly harsh or oppressive." *Id.*  In this case, both procedural and substantive unconscionability are present in a substantial degree.

Procedurally, there is no doubt that these Terms are adhesion contracts and offer no ability for content providers to negotiate or seek clarification or revision. It's the same set of Terms for every content provider.   Adhesion contracts automatically satisfy the procedural unconscionability requirement under California law.  *Trivedi v. Curexo Technology Corp.*, 189 Cal.App.4th 387, 393 (2010).  Moreover, the fact that Google refers in its Motion to the Terms being the most recent version suggests that Defendants numerously unilaterally changed these terms without the knowledge or input of content creators such as Plaintiffs throughout the time they have had a relationship with YouTube.  In *Adams*, the

1   Court found that the standard-form contract, drafted by the party with superior

2   bargaining power, was procedurally unconscionable as a contract of adhesion.

3   *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889. 893 (9th Cir. 2002).

4       Substantively, Plaintiffs take issue with a single sentence of the Terms,

5   which should be severed from any agreement: "YouTube is not obligated to display

6   any advertisements alongside your videos and may determine the type and format of

7   ads available on the YouTube Service."  Such a provision renders the compensation

8   structure outlined in the Terms utterly meaningless.  A content provider is only paid

9   if their videos have advertisements placed on them.  YouTube, with this single

10  clause, is undermining the rest of the compensation terms by retaining the sole

11  unfettered right to determine which videos it wants to place advertisements on,

12  without restriction, caveat, or even explanation.  *Adpocalypse* demonstrates that the

13  problem with such a provision is that YouTube can change how they monetize or

14  demonetize at any time without telling anyone that they are doing it or how they are

15  doing it.  This is the most important part of the contract: "how do I get paid?"

16      The unconscionability doctrine ensures that contracts, particularly contracts

17  of adhesion, do not impose terms that have been variously described as "overly

18  harsh" (*Stirlen v. Supercuts, Inc.*, 51 Cal.App.4th 1519, 1532 (1997)), "unduly

19  oppressive" (*Perdue v. Crocker National Bank*, 38 Cal.3d 913, 925 (1985)), "so

20  one-sided as to shock the conscience" (*Pinnacle Museum Tower Assn. v. Pinnacle

21  Market Development*, 55 Cal.4th 223, 246 (2012)), or "unfairly one-sided" (*Little

22  v. Auto Stiegler, Inc.*, 29 Cal.4th 1064, 1071 (2003)); *Armendariz*, 24 Cal. 4th at

23  114; *see also Ingle v. Circuit City Stores, Inc.,* 328 F.3d 1165, 1172 (9th Cir.2003)

24  (defining substantive unconscionability as whether the terms of an agreement are

25  so one-sided as to shock the conscience).  This can be shown if the disputed

26  provisions of the agreement fall outside the reasonable expectations of the party of

27  inferior bargaining power in an adhesion contract.  *Graham v. Scissor-Tail, Inc.*, 28

28

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**                                    12

Cal. 3d 807, 820 (1981).[11]

The California Supreme Court has interpreted California contract law to allow for unilateral contract modifications provided that the party's power to do so is limited by fairness and reasonable notice. *Asmus v. Pacific Bell*, 23 Cal.4th 1, 16 (2000). "An illusory promise is one containing words 'in promissory form that promise nothing' and which 'do not purport to put any limitation on the freedom of the alleged promisor.'" *Flores v. Am. Seafoods Co.*, 335 F.3d 904, 912 (9th Cir. 2003) (quoting 2 Corbin on Contracts 142 (rev. ed. 1995)). Applying these principles, the California Court of Appeal found that there is an implied covenant of good faith that can prevent a unilateral modification provision from otherwise rendering a contract illusory because "the party with that authority may not change the agreement in such a manner as to frustrate the purpose of the contract." *Serpa v. Cal. Sur. Investigations, Inc.*, 215Cal.App.4th 695, 706 (2013). Further, "when ... the agreement is silent as to notice, implied in the unilateral right to modify is the accompanying obligation to do so upon reasonable and fair notice." *Id.* at 708.[12]

---

[11] All of these formulations point to the central idea that the unconscionability doctrine is concerned not with "a simple old-fashioned bad bargain" but with terms that are "unreasonably favorable to the more powerful party." *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal.4th 1109, 1145 (2013) (citing *Schnuerle v. Insight Communications Co.*, 376 S.W.3d 561, 575 (Ky. 2012) and 8 Williston on Contracts (4th ed. 2010) § 18.10, p. 91). These include "terms that impair the integrity of the bargaining process or otherwise contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law, fine-print terms, or provisions that seek to negate the reasonable expectations of the nondrafting party, or unreasonably and unexpectedly harsh terms having to do with price or other central aspects of the transaction." (*Ibid.*)

[12] See also *Casas v. Carmax Auto Superstores California LLC,* 224 Cal.App.4th 1233, 1237 (2014) ("[u]nder California law ... even a modification clause not providing for advance notice does not render an agreement illusory, because the agreement also contains an implied covenant of good faith and fair dealing"); *24 Hour Fitness, Inc. v. Superior Court*, 66 Cal.App.4th 1199, 1214 (1998); *Sparks v. Vista Del Mar Child & Family Servs.*, 207 Cal.App.4th 1511, 1523 (2012).

1    However, the Ninth Circuit has held that unilateral modification provisions

2  are unconscionable.  *See Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 926 (9th

3  Cir. 2013); *Net Glob. Mktg., Inc. v. Dialtone, Inc.*, 217 Fed.Appx. 598, 602 (9th

4  Cir. 2007); *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1179 (9th Cir. 2003).

5  In *Ingle*, the Ninth Circuit found an employer's grant of unilateral modification

6  power "proscribes an employee's ability to consider and negotiate the terms of her

7  contract." *Id.*  Similarly, the Ninth Circuit affirmed in *Net Global* that a unilateral

8  modification provision was unconscionable.  217 Fed.Appx. at 602.  Indeed, This

9  Honorable Court has agreed with this line of reasoning, and held that unilateral

10 modification provisions are unconscionable and severable.  *See Mohamed v. Uber*

11 *Technologies, Inc.*, 109 F.Supp.3d 1185, 1228–29 (N.D. Cal. June 9, 2015);

12 *O'Connor v. Uber Technologies, Inc.,* 150 F.Supp.3d 1095 (N.D. Cal. 2015).[13]

13   Understanding how YouTube works is important.  YouTube allows content

14 creators like Plaintiffs to post their content to the YouTube platform.  Consumers

15 are drawn to YouTube wanting to view the content.  They are then exposed to more

16 content, which they are encouraged to view by being surrounded by suggestions

17 made by YouTube's platform.  YouTube also auto-plays another suggested video

18 once one video ends.  Thus, a consumer may come to YouTube to watch Video A,

19 and end up watching Videos A, B, C, D, etc…  Each video, if they are monetized,

20 generates more revenue for YouTube, and the content creator.  Thus, even a video

21 that is not directly generating ad revenue because it has been demonetized, may still

22 be generating revenues for YouTube through indirect means.

23   In this context, the unfairness and illusory nature of the disclaimer is in fact

24 shocking.  There is no provision to keep YouTube honest in how it applies that

25 disclaimer, and indeed, what happened to content creators during *Adpocalypse*

26 _____

[13] *See also Sparks and Macias v. Excel Bldg. Servs. LLC*, 767 F.Supp.2d 1002,

27 1010–11 (N.D.Cal.2011); *Poublon v. Robinson Co*., No. 2:12–CV–06654–CAS

MA, 2015 WL 588515, at *10 (C.D. Cal. Jan. 12, 2015); *Ridgeway v. Nabors*

28 *Completion & Production Services Co*., 139 F.Supp.3d 1084 (C.D. Cal. 2015).

demonstrates just how fragile the system is if such a term is deemed enforceable. YouTube's promise to pay 55% of all ad revenue as compensation becomes completely hollow if it can demonetize videos for any reason at all, at its sole discretion.   Changing or modifying the existing monetization practices that have been consistently in place for years is no different than other unconscionable unilateral modification clauses that Ninth Circuit Courts have struck down time and again.   This makes sense.   What YouTube has done is akin to the law firm partner being relegated to administrative work and subjected to a 95% salary reduction. There isn't even a policy given to content providers that governs how such decisions to demonetize can be rendered, and thus, content creators have no guide to know whether what they create will be monetized or not.   Defendants benefit from this uncertainty and bear none of the risk, because they aren't the ones spending resources creating content, so they have little incentive to care.   This shocks the conscience, and thus, the objectionable disclaimer provision should be severed.[14]

## 2. California Law Holds That Plaintiff's Good Faith And Fair Dealing Claim Is The Only Thing That Could Potentially Save The Partner Program Terms From Being Illusory

There is a spirited debate going on now between the Ninth Circuit and the California Court of Appeal as to whether the unconscionability analysis above is the correct approach (resulting in the striking of the offending disclaimer from such terms), or whether such a provision is contractually enforceable, but subject to the requirement of good faith and fair dealing.   Perhaps no cases analyzes this

---

[14] When an agreement is not otherwise permeated by unconscionability, the offending provision, which is collateral to the purpose of the contract, is properly severed and the remainder of the contract enforced.   *See Serpa v. California Surety Investigations, Inc.*, 215 Cal.App.4th 695, 709-710 (2013); *Roman*, supra, 172 Cal.App.4th at p. 1462, 92 Cal.Rptr.3d 153; *Armendariz*, at p. 122, 99 Cal.Rptr.2d 745, 6 P.3d 669 [although Civ.Code, § 1670.5 gives trial court some discretion whether to sever the unconscionable provision or refuse to enforce entire agreement, it also appears "to contemplate the latter course only when an agreement is 'permeated' by unconscionability"]; *Dotson v. Amgen, Inc.*, supra, 181 Cal.App.4th at pp. 985–986, 104 Cal.Rptr.3d 341 [same].)

---

better than the decision of *Ridgeway v. Nabors Completion & Production Services Co.*, 139 F.Supp.3d 1084 (C.D. Cal. 2015).  The split goes as follows: the Ninth Circuit (and most District Courts) think that the disclaimer Plaintiffs take issue with should be stricken as unconscionable since it otherwise renders the contract illusory and one sided.[15]  The California Court of Appeal thinks it should be upheld but that no activity can be undertaken which would "frustrate the purpose of the contract." *Serpa v. Cal. Sur. Investigations, Inc.*, 215Cal.App.4th 695, 706 (2013).  This means that any action taken by YouTube with respect to its unilateral discretion to decide when to monetize and when to demonetize must be carried out with an even hand, that changes to such procedures require fairness and reasonable notice, and are governed by strict application of the good faith and fair dealing doctrine under California Contract Law. *Asmus v. Pacific Bell*, 23 Cal.4th 1, 16, (2000); *Serpa*, 215 Cal.App.4th at 706.[16]  Simply put, if YouTube's non-obligation to monetize provision is not unconscionable or illusory, then it **absolutely must** be governed by the covenant of good faith and fair dealing.  YouTube can't have it both ways.

Plaintiffs have pled in extreme levels of detail exactly how YouTube has flubbed its application of the new demonetization practices, and how such blunders levied great harm on content providers.  The Honorable Court will have

---

[15] *See Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 926 (9th Cir. 2013); *Net Glob. Mktg., Inc. v. Dialtone, Inc.*, 217 Fed.Appx. 598, 602 (9th Cir.2007); *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1179 (9th Cir.2003).

[16] *Perdue v. Crocker National Bank*, 38 Cal.3d 913, 923, (1985) ("'where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing'"); *Badie v. Bank of America*, 67 Cal.App.4th 779, 787–788, (1998) (contracting party with unilateral right to modify contract does not have "carte blanche to make any kind of change whatsoever"; unilateral right to modify, when limited by implied covenant of good faith and fair dealing, requires party holding the power to affect the other party's rights to exercise it in a manner consistent with the reasonable contemplation of the parties at the time of the contract.)

---

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**                    16

to make a legal decision as to whether YouTube's disclaimer is unconscionable, subject to good faith, or both. But dismissing this lawsuit in full would be in error.

**B. <u>Section 230(c) Of The CDA Does Not Bar Plaintiffs' Claims</u>**

Let us remember what this case is about: breach of contract, breach of good faith, and an allegation that such systemic conduct is unfair and anticompetitive. This case is not about censorship, or limitations to freedom of expression on the Internet. Yet, Defendant mistakenly asserts that the law provides blanket immunity from liability despite allegedly engaging in bad faith in their contracts with content creators, due to "editorial discretion" it supposedly maintains in demonetizing certain content posted on its website. Defendants assert this immunity under the Communications Decency Act (CDA), 47 *U.S.C.* 230(c), which immunizes interactive computer services from liability for the editorial discretion they exhibit over the content published on the website daily. The classic example of when the CDA applies is where Third Party A posts something on Company B's website that harms Third Party C, and Third Party C sues Company B for allowing the content to be posted. Company B is given immunity under the CDA. That is editorial discretion in its purest most unadulterated form. But it is not what happened here.

At its core, the Communications Decency Act bars lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions, such as deciding whether to publish, withdraw, postpone or alter content. 47 U.S.C.A. § 230. However, "[n]othing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section." 47 U.S.C.A. § 230.(e)(3). Indeed, the statute asserts a specific criteria outlining the limits of editorial discretion these interactive computer services have. 47 *U.S.C.* 230(c)(2)(A). Defendants argue immunity is justified for them because the decision to monetize a video is an editorial decisions. This is plainly wrong.

The case of *Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 884 (N.D. Cal. 2015) is directly on point. There, plaintiff brought claims against Google alleging

breach of contract and tortious interference, when YouTube removed a music video from its website for violating its terms of service. The video was not "otherwise objectionable," but nonetheless, Google used the same argument it uses here: that it was using its editorial judgment to remove content that it subjectively believed to be objectionable. The District Court disagreed. It found that YouTube was overreaching in its application of § 230(c), which states that:

> No provider or user of an interactive computer service shall be held liable on account of—
> (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected....

"Here, the context provides additional evidence Congress did not intended 'otherwise objectionable' to refer to (as YouTube believes) anything which it finds undesirable for any reason." *Id*. at 883. In short, YouTube may have wanted to have discretion to remove the content because it posed a problem for its business interests, but such an "artificially inflated view" was not the same thing as it being "otherwise objectionable." *Id.* at 882-84.[17]

There are three problems in the case at bar with Defendants' position. First, Plaintiffs' entire complaint makes it painfully clear that the problem they have with YouTube's demonetization algorithms is that they *do not* effectively focus on objectionable content, but rather overbroadly target non-objectionable content arbitrarily, for reasons that benefit Defendants' business interests, not which act as a method of policing the Internet and cleaning objectionable content from its site.

---

[17] *See also Goddard v. Google, Inc*., No. C 08–2738 JF (PVT), 2008 WL 5245490, at \*6 (N.D.Cal. Dec. 17, 2008) (finding that information "relat[ing] to business norms of fair play and transparency are ... beyond the scope of § 230(c)(2)"); *Nat'l Numismatic Cert., LLC v. eBay, Inc*., No. 6:08–cv–42–Orl–19GJK, 2008 WL 2704404, at \*25 (M.D.Fla. July 8, 2008) (Congress did not intend "otherwise objectionable" to refer to auction of potentially counterfeited coins).

---

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**                    18

If Defendant disagrees with these allegations, it is fighting against the allegations in the complaint, which must be assumed to be true for purposes of a motion to dismiss.  This argument can only be made on summary judgment.

Second, YouTube is not *removing* content from its website at all, but rather simply demonetizing it.  Plaintiffs' content is still on YouTube, and still generating views and bringing consumers to the site.  Plaintiffs just aren't getting paid for it anymore.  This is important because § 230(c) only provides immunity where the actions taken are attempting to "restrict access to or availability of material."  YouTube is not alleged to be doing that at all.  Thus, the CDA does not immunize its conduct.  Third, YouTube is alleged to be acting in bad faith, as a core part of the complaint.  Indeed, it is perhaps Plaintiffs' strongest claim that YouTube is violating the covenant of good faith and fair dealing, by improperly altering its monetization policies without notifying content providers of what is going on, which, as described above, is an abuse of the Terms of Use.

Standard breach of contract claims like the ones brought by Plaintiffs are not inconsistent with the CDA, which expressly permits such state law claims.  The Court should not grant Defendants § 230(c) immunity, as their recently-adopted arbitrary and secretive demonetization practices clearly have little to do with Congress's intent in granting immunity to those patrolling the harmful effects of the Internet.  *See Federal Trade Commission v. LeadClick Media, LLC*, 838 F.3d 158 (2nd Cir. 2016) (describing the history of the CDA).

### C. Plaintiffs Have Asserted Sufficient Facts For A Determination Based On Theories Of Contract And Tort Law

#### 1. Breach of Contract

"To state a claim for breach of contract, a plaintiff must plead sufficient facts to establish: (1) the existence of a contract; (2) the plaintiff's performance under the contract; (3) that the defendant breached the contract; and (4) the breach resulted in damage to the plaintiff."  *See*, *Raymat Materials, Inc. v. A & C CATALYSTS, INC.*, No. C 13-00567 WHA, 2013 WL 3662477, at *1 (N.D. Cal. July 12, 2013) (citing,

*Walsh v. W. Valley Mission Cmty. Coll. Distr.*, 66 Cal.App. 4th 1532, 1545 (1998)).

Here, Plaintiffs meet the burden to sufficiently plead breach of contract because the First Amended Complaint plainly alleges the necessary requirements. The First Amended Complaint asserts the existence of a contract between these parties, because Plaintiffs asserted they uploaded content to YouTube in accordance with Defendant's terms and conditions. Dkt. 13 ¶ 2. Plaintiffs assert a breach occurs because Defendant arbitrarily modified the terms and conditions governing its relationship with Plaintiffs and other content providers, and failed to properly notice them of this change. Dkt. 13 ¶ 6, 30-33. Due to Defendant's arbitrary modification of the contract, Plaintiffs suffered a loss of up to 95% of its revenue from content published on Defendants' website. Dkt. 13 ¶ 32. Thus, Plaintiffs allege a claim for breach because Defendant's secretive and arbitrary modification of the contract between them caused Plaintiffs to lose nearly all of the revenue of their hard work.

### 2. Breach of Implied Covenant of Good Faith

"A breach of the implied covenant of good faith and fair dealing does not require a breach of a specific provision of a contract." *Abbit v. ING USA Annuity & Life Ins. Co.,* 252 F. Supp. 3d 999, 1010 (S.D. Cal. 2017). "Rather, '[t]he covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made.'" *Id.* (citing *Guz v. Bechtel Nat. Inc.,* 24 Cal.4th 317, 349–50 (2000)). "The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." *Id.* at 1011.

While Defendant attempts to hide behind its discretionary advertising language, its incorporation of its other policies creates a nexus that permits the analysis of whether its unilateral cessation of advertising was not in good faith. The YouTube Partner Program incorporates the YouTube Partner Program Policies.

---

Dkt. 19-1.  The Partner Program Policies notes that failing to comply with these policies could result in <u>disabling ads from your content</u>, making the default assumption that ads are not disabled from content.  Dkt. 19-4.  Further, the "Monetization Basics & Policies Pages" incorporated into the Partner Program Policies outlines how ads will be served onto videos that are approved for the Partner Program, and goes as far to note that "[o]nce you turn on monetization, it may take some time for ads to appear," not that ads may not appear at all.[18]

These additional pages create a nexus similar to the insurance company report being incorporated into the contract in *Abbit*.  While Defendant's disclaimer on its own may create confusion and a lack of promise, its extensive other policies and pages that are explicitly "incorporated by reference" create a promise of advertising revenue and monetization.  Thus, just as in *Abbit*, this Court should find that Defendant had a discretionary power over its monetization of ads that it needed to exercise in good faith.  As discussed throughout the rest of this Opposition, it has failed to do so.

### 3.  <u>Breach of Quasi-Contract</u>

"Quasi-contracts arise under the law of restitution as a remedy against unjust enrichment…."  *Telecom Asset Mgmt., LLC v. Fiberlight, LLC*, 203 F. Supp. 3d 1013, 1020 (N.D. Cal. 2016).  It is "not based on the apparent intention of the parties to undertake the performances in question, nor are they promises.  They are obligations created by law for reasons of justice."  *Id.*  "Quasi contractual recovery is based upon benefit accepted or derived for which the law implies an obligation to pay."  *Id.*  The benefits conferred must ordinarily occur as a result of defendant's request; otherwise, though there is enrichment, it is not unjust."  *Id.*

Contrary to Defendant's assertion regarding the inexistence of a request for performance, Plaintiffs properly assert that Defendants sought performance in the

---

[18] How ads show on videos you monetize, https://support.google.com/youtube/answer/7438625?hl=en&ref_topic=1115890, last accessed January 25, 2018 from links in Dkt. 19-4.

form of content uploaded by Plaintiffs.  In exchange, Defendant promised that it would share its ad revenue.  By then unilaterally changing its monetization policy after enticing Plaintiffs to perform, Defendants were unjustly enriched through Plaintiffs' work because of the non-shared revenue it receives from having Plaintiffs' high quality content on its site.   This is further highlighted by Defendant's payment of 90% more to Plaintiffs prior to *Adpocalypse* in order to induce Plaintiffs to produce and post new content, which Defendants then slashed even though Plaintiffs had continued to perform the requested services.  Defendant has been unjustly enriched.

### 4. <u>Tortious Interference</u>

"Under California law, the elements of the tort of intentional interference with contractual relations are: '(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'"  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).   Defendant erroneously argues Plaintiffs cannot assert a claim under tortious interference because Defendant lacked specific knowledge of any economic advantage to Plaintiffs.   Dkt. 29 at 16.   General knowledge of the relationship may suffice showing an act of interference, even if Defendant cannot identify the specific parties, so long as it knows it is interfering with a contractual relationship.   *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1092 (9th Cir. 2005); *see also Monex Deposit Co. v. Gilliam*, 680 F. Supp. 2d 1148, 1163 (C.D. Cal. 2010).   Defendant knew that its *Adpocalypse* would negatively impact the value of the channels which it arbitrarily stripped significant revenue from, and thereby interfere with contracts to sell those channels.  Plaintiffs directly experienced this interference from Defendants' actions by losing a contract to sell their channel for $60,000.  Dkt. 23 at ¶ 45.  Defendants have committed tortious

interference with Plaintiff's contract.

### 5. Plaintiffs Have Properly Pled A Cognizable UCL Theory[19]

"The scope of the UCL is quite broad." *McKell v. Wash. Mut., Inc.*, 49 Cal. Rptr. 3d 227, 238 (Ct. App. 2006). The UCL was "intentionally framed" with "sweeping language" to enable courts to address "the innumerable new schemes which the fertility of man's invention would contrive." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 540 (1999). In a UCL unfairness case, courts apply one or more of three tests to assess the sufficiency of a claim: (1) the traditional balancing test; (2) the FTC Act section 5 test;[20] or (3) the Cel-Tech tethering test. "California courts remain the ultimate arbiters of the meaning and scope of the unfair competition law." *Id*. at 543.

While this is not a traditional consumer case, neither is it a traditional business to business case. California Courts have noted that the tethering test should not be applied to consumer cases, as "section 17200's 'unfair' prong should be read more broadly in consumer cases because consumers are more vulnerable to unfair business practices than businesses and without the necessary resources to protect themselves from sharp practices." *Progressive W. Ins. Co. v. Yolo Cty. Super. Ct.*, 37 Cal. Rptr. 3d 434, 453 (2005). Indeed the California Supreme Court expressly declined to adopt the tethering test in consumer cases for this very reason. *Cel-Tech*, 973 P.2d at 544 n.12 (citing *Sperry & Hutchinson*, 405 U.S. 233). Thus, in this case where small vulnerable content creators are going up against Google, not as competitors but as a form of business consumer of their services, it would be more appropriate to apply the balancing test here.

"To test whether a business practice is unfair, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged

---

[19] Plaintiffs will agree to dismiss their claims under the fraudulent and unlawful prongs of the UCL.

[20] The FTC test does not apply to this case. The other two both do.

victim." *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1028 (N.D. Cal. 2012). Assessing whether a business practice is unfair entails "an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer." *South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal.App.4th 861, 886-887 (1999). The balancing test employs the disjunctive, forbidding a practice that "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious." *Id.* YouTube's conduct is all of this and more. It failed to disclose any information to content creators, relating to its monetization policies, and then unilaterally and dramatically changed the way it monetized content without notifying them that it would do so, or how it would do so, giving them no recourse. This is a textbook definition of oppressive and injurious conduct. Plaintiffs are not alone. There was uproar on YouTube about this, videos posted about it, news stories, and thousands of people who were economically crippled as a result. In short, it was inequitable for YouTube to have withheld this information from content creators and acted unilaterally in such a reckless manner with the livelihoods of so many people at stake.

Plaintiff's claims meet the tethering test as well, even though the test generally applies to claims brought by business competitors to the defendant. First and foremost, Defendant's only argument in its brief seems to be that Plaintiffs suffered some sort of individualized harm, not harm that was suffered by the public. The allegations in the complaint show otherwise. This was a widespread problem that negatively impacted thousands of people, and continues to do so.

A competitor's act or practice will be condemned under the tethering test if, like YouTube's arbitrary and secretive modifications to its monetization practices, it "significantly threatens or harms competition." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 186-187 (1999). YouTube's tethering argument narrowly and erroneously focusses on Plaintiffs'

own damages.  That is not the focus of the complaint for purposes of the UCL claim.  Rather, Plaintiffs are alleging that it is harmful to the entire creative content industry for Google, who is a virtual monopoly when it comes to forums for posting creative content, to engage in conduct which systematically threatened the entire online creative video content community.

Plaintiffs state a cause of action tethered to the established policy against hindering business competition on the merits, as well as a cause of action under the balancing test.  The UCL claim should accordingly be upheld.

## V. CONCLUSION

If a business engages in arbitrary bad faith conduct towards a party with whom they are business partners, which is not in line with historical treatment, or contemplated by their contract, and causes hundreds of thousands of dollars in damages to that party, California law holds that to be illegal.  You can't disclaim it away simply because you put a clause in a contract that is one sided and gives you unilateral control to act in bad faith, and you can't get away with it simply because you happen to be engaging in business on the Internet.  This case needs to proceed. It is an important case about transparency in contract, and about how big companies like Google can't simply use its statute to trample all over the rights of small entrepreneurs seeking to earn their slice of the American Dream.

For the foregoing reasons, Plaintiffs respectfully requests the Court deny Defendant's motion in its entirety. Should the Court grant Defendant's Motion, in whole or in part, Plaintiffs respectfully requests leave to amend the complaint.

Dated**:** January 25, 2018          **Law Offices of Todd M. Friedman, P.C.**

By: _/s/ Adrian R. Bacon____
Adrian R. Bacon, Esq.
Attorneys for Plaintiff

# CERTIFICATE OF SERVICE

Filed electronically on this 25th day of January, 2018, with:

United States District Court CM/ECF system
Notification sent electronically on this 25th day of January, 2018, to:

Honorable Judge Edward M. Chen
United States District Court
Northern District of California

MAURA L. REES
ANTHONY J WEIBELL
WILSON SONSINI GOODRICH & ROSATI


s/Adrian R. Bacon
Adrian R. Bacon

PROOF OF SERVICE