UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES SWEET, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>GOOGLE INC., et al.,<br><br>　　　　Defendants. | Case No. 17-cv-03953-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Docket No. 29 |

Plaintiffs are James Sweet, Chuck Mere, and Zombie Go Boom, LLC (collectively "Zombie"). Mr. Sweet and Mr. Mere are the owners of Zombie Go Boom, which operates a channel – Zombiegoboom – on YouTube. Zombie has been able to "monetize" the content it displays on its YouTube channel because Defendants Google, LLC and/or YouTube, LLC (collectively, "YouTube") have a program under which content providers can get a cut of the revenue that YouTube makes from third-party advertisements. Zombie has filed a class action lawsuit against YouTube, asserting that its revenues and the revenues of other content providers have significantly fallen after YouTube put restrictions on the placement of advertisements that did not meet YouTube guidelines. Currently pending before the Court is YouTube's motion to dismiss.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** the motion to dismiss.

## I.　FACTUAL & PROCEDURAL BACKGROUND

In its first amended complaint ("FAC"), Zombie alleges as follows.

"YouTube is [a] video-sharing website, which contracts with content providers to upload videos, to be viewed by members of the public worldwide." FAC ¶ 19. YouTube has been able to

monetize the content on its website "by permitting third party advertisers, such as Wal-Mart, Verizon, General Motors and many others, to place advertisements at the beginning of videos." FAC ¶ 22. YouTube shares the advertising revenue it makes with content providers, which is an incentive for content providers "to focus on creating content as a full time job." FAC ¶ 23.

Zombie is a content provider who, prior to the alleged misconduct by YouTube, was able to earn a living wage by working exclusively as a YouTube content provider. *See* FAC ¶ 24 (alleging that Zombie had over 1.6 million subscribers to its YouTube channel). From approximately 2011, when the Zombiegoboom channel was founded, until the time of the alleged YouTube misconduct, Zombie made approximately $10,000 to $15,000 per month. *See* FAC ¶¶ 25-26.

YouTube uses a program called AdSense to control placement of advertisements, depending on content provided and audience.[1] *See* FAC ¶ 22. In or about March 2017, YouTube changed the algorithm used in AdSense. Apparently, YouTube took action because, in early 2017, it "was hit with a wave of bad press" after advertisements were placed on videos that contained hate speech and sexually explicit material, FAC ¶ 28, which, in turn, led to "approximately five percent of YouTube's advertisers [to] back[] out of agreements to place their advertisements on YouTube's content providers' videos." FAC ¶ 29. YouTube changed the AdSense algorithm without notice (advance or otherwise) to the consent providers, without the consent of content providers, and without sharing with content providers what exact substantive changes were made to the algorithm. *See* FAC ¶¶ 5-6, 33, 36-38. (In spite of the above allegation, Zombie seems to admit that YouTube did release new guidelines regarding restrictions put on the placement of advertisements. *See* FAC ¶ 5.)

The change to the AdSense algorithm was "an attempt to automatically weed out inappropriate content, without the use of human oversight." FAC ¶ 30. As it turns out, the algorithm was not effective: (1) It "under-inclusively failed to capture and demonetize content that

---

[1] AdSense has an algorithm that "automatically rates videos . . . in a similar way to movie ratings (G to R) or video game ratings such as E (for everybody) to M (for mature). After the videos are automatically put into a category, advertisers can then [choose] to filter their advertisements to only be placed on certain categories of videos." FAC ¶ 33.

2

was sexually explicit, racist or otherwise not in compliance with the spirit of [YouTube's] guidelines," and (2) it "over-inclusively demonetiz[ed] content that did not violate the spirit of the guidelines and was not objectionable to advertisers." FAC ¶ 7. Zombie fell into the latter category. *See* FAC ¶ 31. Zombie claims that there are "thousands of [other] examples" although it identifies only one other example in its FAC. FAC ¶ 40 (referring to a review for a "'review of a burger'" which was deemed objectionable under the new AdSense algorithm). Zombie and other content providers have dubbed the date that the algorithm was changed "Adpocalypse." *See* FAC ¶ 32.

As a result of the algorithm change, Zombie's advertising revenue fell. For example, after March 27, 2017, Zombie's advertising revenue fell from $300-$500 per day to $20-$40 per day. *See* FAC ¶ 32.

Adpocalypse has also affected Zombie in other economic ways. For example, prior to Adpocalypse, a third party offered Zombie $60,000 to purchase all of its existing online content; that offer, however, was rescinded after Adpocalypse. *See* FAC ¶ 45. Also, prior to Adpocalypse, Zombie was offered $25,000 to promote other products (outside the context of YouTube); after Adpocalypse, Zombie was able to contract for only $3,500 – and ultimately it received only $1,1500 because the response to the promotion did not garner the business anticipated. *See* FAC ¶ 46.

Based on, *inter alia*, the above allegations, Zombie has asserted the following claims for relief:

(1) *Violation of California Business & Professions Code § 17200.* In its opposition brief, Zombie states that it is now proceeding with a theory of unfairness only, and not unlawfulness or fraud. *See* Opp'n at 23 n.19 ("Plaintiffs will agree to dismiss their claims under the fraudulent and unlawful prongs of the UCL."). As alleged in the FAC, YouTube has engaged in unfair conduct because it "devised and executed a material change to its advertising terms and AdSense practices, without providing any notice, either before[,] during[,] or after, in any conspicuous manner, to Plaintiffs or other providers," and "[w]ith the intent and effect of stifling open and vigorous

competition in the market for content providers." FAC ¶ 68(a). YouTube's conduct was also unfair in that it has "forc[ed] Plaintiffs and Class members to adhere to [its] undisclosed practices." FAC ¶ 68(d).

(2) *Tortious interference with contractual relations and/or prospective economic advantage.* According to Zombie, "YouTube was aware that Plaintiffs and Class members routinely enter into such related contracts with third parties, and that changes to [the] monetization structure, including demonetizing videos without notice or recourse, and altering the terms by which videos would receive compensation would have a direct impact on these contractual arrangements." FAC ¶ 95.

(3) *Breach of contract.* Zombie alleges that the parties had a contract under which it was "permitted to engage with YouTube as a content provider" and a contract that "governed [the] monetization structure for the posting of [its] content on YouTube." FAC ¶ 101. Zombie further alleges that YouTube breached the contract(s) by "altering the terms and conditions governing how Plaintiffs' and Class members' videos would be monetized." FAC ¶ 102.

(4) *Breach of the duty of good faith and fair dealing.* According to Zombie, YouTube's conduct has "unfairly prevented [Zombie] from receiving the benefits of the [above] contract[s]." FAC ¶ 110.

(5) *Breach of quasi-contract.* Zombie alleges that YouTube "created a contract or quasi-contract through which [it] received and continues to receive a benefit of monetary compensation without providing the consideration promised to Plaintiff and Class Members." FAC ¶ 117.

YouTube now challenges Zombie's FAC in a 12(b)(6) motion to dismiss.[2] Although YouTube's motion is a 12(b)(6) motion, it has filed a declaration in support of the motion and attached to the declaration are several pieces of evidence. The declaration is from a software

---

[2] YouTube previously moved to dismiss Zombie's original complaint but that motion was never heard as Zombie took the opportunity to amend its complaint instead. YouTube argues that the amended pleading still has the same deficiencies as the original.

4

engineer at YouTube who testifies as follows:

- Through the YouTube website, users can upload, share, and watch videos for free. *See* Hawkins Decl. ¶ 2.
- To upload videos, a user must first create a YouTube account. During the process of creating an account, a user must assent to YouTube's Terms of Services Agreement ("TOS"). *See* Hawkins Decl. ¶ 3.
- The TOS incorporates YouTube's Community Guidelines, "which prohibit and caution users from uploading several categories of inappropriate video content." Hawkins Decl. ¶ 4.
- A content provider has the option of participating "in a program that allows users to 'monetize' their videos by allowing Google to display paid third-party advertisements in or alongside those videos." Hawkins Decl. ¶ 5. To participate in this program, "users must manifest their asset to *additional* terms and conditions. For most users, these are the standard 'YouTube Partner Program Terms.'" Hawkins Decl. ¶ 5 (emphasis added). The YouTube Partner Program Terms expressly incorporate the TOS and 'YouTube Partner Program Policies.'" Hawkins Decl. ¶ 6.
- With respect to Zombie, it assented to the TOS on March 29, 2011 when it first created its YouTube account and YouTube channel. *See* Hawkins Decl. ¶ 7. In addition, it assented to the YouTube Partner Program Terms "that were operative during the time of the events alleged in the Complaint (March 2017)" on January 3, 2017. Hawkins Decl. ¶ 8.

Attached to the declaration are the TOS, the Community Guidelines, the Partner Program Terms, and the Partner Program Policies. *See* Hawkins Decl., Exs. 1-4. YouTube argues that the Court may consider this evidence, even on a 12(b)(6) motion to dismiss, because Zombie expressly referred to the TOS and Partner Program Terms in its complaint.[3] *See, e.g.*, *Swartz v.*

---

[3] YouTube points, in particular, to ¶ 101 of the FAC which states as follows: "A contract existed between [Zombie] and Class members and [YouTube], which governed the terms and conditions by which [Zombie was] permitted to engage with YouTube as a content provider. Similarly a contract existed between [Zombie] and Class members and [YouTube] which governed

5

*KPMG* LLP, 476 F.3d 756, 763 (9th Cir. 2007) (stating that, "[i]n ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice" but, "in order to '[p]revent[] plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting . . . documents upon which their claims are based,' a court may consider a writing *referenced in a complaint but not explicitly incorporated therein if the complaint relies on the document and its authenticity is unquestioned*") (emphasis added). The Court agrees that it may take into consideration the exhibits attached to the Hawkins declaration, in particular because the TOS and Partner Program Terms are referenced and relied upon in Zombie's complaint, and the Community Guidelines and Partner Program Policies are incorporated by reference in the TOS and Partner Program Terms, respectively. Zombie does not dispute that the documents may be taken into consideration – in fact, Zombie asks the Court to consider the documents itself.

For purposes of the pending motion, the critical contract term is one contained in the Partner Program Terms. That provision states as follows:

> Advertising Revenues. YouTube will pay you 55% of net revenues recognized by YouTube from ads displayed or streamed by YouTube or an authorized third party on your Content watch pages or in or on the YouTube video player in conjunction with the streaming of your Content. **YouTube is not obligated to display any advertisements alongside your videos and may determine the type and format of ads available on the YouTube Service.** For clarity, YouTube reserves the right to retain all other revenues derived from the YouTube service, including any revenues relating to ads on search page results.

Hawkins Decl., Ex. 1 (YouTube Program Partner Terms at 1) (emphasis added).

## II.   DISCUSSION

A.   Legal Standard

> To survive a [12(b)(6)] motion to dismiss for failure to state a claim after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), [a plaintiff's] factual allegations [in the complaint] "must . . . suggest that the claim has at least a plausible chance of success." In

---

[Zombie's] monetization structure for the posting of [its] content on YouTube." FAC ¶ 101 (alleging such in breach-of-contract claim).

6

>other words, [the] complaint "must allege 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"
>
>. . . . [The Ninth Circuit has] settled on a two-step process for evaluating pleadings:
>
>>First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively.  Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

*Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134-35 (9th Cir. 2014).

Notably,

>[t]he plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility 'of entitlement to relief.'"

*Iqbal*, 556 U.S. at 678.

B. <u>Failure to State a Claim for Relief – All Claims</u>

In its motion to dismiss, YouTube makes a number of arguments but the primary one is that all of Zombie's claims for relief lack merit because the conduct of which Zombie complains – in essence, failure on the part of YouTube to post advertisements alongside Zombie's content – is expressly permitted by the parties' contract:

>[Zombie's] claims are precluded by the express terms of the parties' written contract.  That agreement – the YouTube Partner Program Terms – could hardly be clearer that YouTube has no obligation to display ads in connection with Plaintiffs' videos: "**YouTube is not obligated to display any advertisements alongside your videos and may determine the type and format of ads available on the YouTube Service.**" . . . .
>
>It is a bedrock principle of California law that no cause of action will lie where it is based on lawful conduct expressly permitted by a governing contract.

Mot. at 5-6 (footnote omitted; emphasis added).

While the above provision places no limit on YouTube's decisionmaking with regard to

7

advertisements, Zombie nonetheless argues that the "disclaimer" ("YouTube is not obligated to display any advertisements," etc.) has implied limits, *i.e.*, it must be applied in good faith or otherwise the term is unconscionable and/or the contract illusory.

Zombie's unconscionability argument lacks merit. Zombie admits that unconscionability requires both procedural and substantive unconscionability, although there is a sliding scale – *i.e.*, "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1244 (2016) (internal quotation marks omitted). With respect to procedural unconscionability, Zombie contends that this element is satisfied because the contract(s) between it and YouTube is one of adhesion.

> Whether the challenged provision is within a contract of adhesion pertains to the oppression aspect of procedural unconscionability [as opposed to the "surprise" aspect]. A contract of adhesion is imposed and drafted by the party of superior bargaining strength and relegates to the subscribing party only the opportunity to adhere to the contract or reject it. [A]bsent unusual circumstances, use of a contract of adhesion establishes a minimal degree of procedural unconscionability notwithstanding the availability of market alternatives."

*Walnut Producers of California v. Diamond Foods, Inc.*, 187 Cal. App. 4th 634, 646 (2010) (internal quotation marks omitted). Arguably, the label of "adhesion contract" is not entirely fair in the instant case. The instant case is not, *e.g.*, a consumer or employment case where adhesive contracts are typically found. Even if the contract(s) at issue were deemed adhesive, that simply establishes a minimal degree of procedural unconscionability such that Zombie would have to establish a fair amount of substantive unconscionability in order to prevail. *Cf. Darnaa, LLC v. Google, Inc.*, No. 15-cv-03221-RMW, 2015 U.S. Dist. LEXIS 161791, at *5 (N.D. Cal. Dec. 2, 2015) (in a case where plaintiff sued regarding the removal and relocation of its music video on YouTube, "find[ing] the level of procedural unconscionability to be slight, as plaintiff does not lack meaningful choice"; even though YouTube "'is undoubtedly a popular video-sharing website,'" plaintiff "could have publicized the music video 'by putting it on various other file-sharing websites or on an independent website'").

Zombie argues there is substantive unconscionability because cases have held that a term

8

that allows a party to unilaterally modify a contract is unenforceable.[4] *See, e.g.*, *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1179 (9th Cir. 2003) (discussing a term that gave employer right to modify or terminate any and all dispute resolution agreements with its employees unilaterally; finding such term substantively unconscionable). But this case law is not on point because Zombie has pointed to no term within YouTube's TOS or Program Partner Terms that gives YouTube has such unilateral right to modify the contract. The term at issue in the instant case – *i.e.*, "YouTube is not obligated to display any advertisements alongside your videos," etc. – has been in the contract from its inception and is not a unilateral modification provision.[5]

Absent a viable theory of unconscionability, Zombie's argument against dismissal comes down to its contention that there must be limits on the above provision ("YouTube is not obligated to display any advertisements alongside your videos," etc.) based on the implied covenant of good faith and fair dealing. According to Zombie, absent application of such covenant, the contract is illusory and thus unenforceable.

While the implied covenant of good faith and fair dealing may be applied where contract terms are silent (*see, e.g.*, *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1426 (9th Cir. 1990) (stating that "the implied covenant may only be used to supply a requirement of good cause for termination [of employment] when the contract between the parties is silent or ambiguous on that subject"), its application to contradict an express term of a contract is narrowly circumscribed. In this regard, *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798 (1995), is instructive. The plaintiff in *Third Story* was a company that owned the rights to the musical output of

---

[4] Zombie primarily relies on federal case law because state case law is somewhat less forgiving. *See Ridgeway v. Nabors Completion & Prod. Servs. Co.*, 139 F. Supp. 3d 1084, 1091-92 (C.D. Cal. 2015) (comparing California case law holding that a term providing for unilateral contract modification is permissible so long as the party's power to modify is limited by fairness and reasonable notice with federal case law holding that unilateral modification provisions can be unconscionable).

[5] YouTube's TOS does seem to have a unilateral modification provision but that provision is not at issue here. *See* Hawkins Decl., Ex. 2 (TOS ¶ 1.B) (providing that, "[a]lthough we may attempt to notify you when major changes are made to these Terms of Service, you should periodically review the most up-to-date version [online and] YouTube may, in its sole discretion, modify or revise these Terms of Service and policies at any time, and you agree to be bound by such modifications or revisions").

singer/songwriter Tom Waits from 1972 to 1983. The plaintiff entered into an agreement with the defendant under which (1) the plaintiff was to produce master recordings featuring performances of Mr. Waits and (2) the defendant had the right to, *inter alia*, manufacture, sell, distribute, and license the recordings *but* the defendant "'may at [its] election refrain from any or all of the foregoing.'" *Id.* at 801. As consideration, the plaintiff was to receive, as a royalty, a percentage of the amount earned by the defendant from its exploitation of Mr. Waits's music. In addition, the defendant was required to pay a specific dollar amount as an advance on royalties. *See id.*

The plaintiff and defendant's dispute arose when the plaintiff wanted to license some of Mr. Waits's recordings but the defendant refused because Mr. Waits did not personally approve the licensing request. The plaintiff sued for breach of the implied covenant of good faith and fair dealing. In response, the defendant countered that "the clause in the agreement permitting it to 'at [its] election refrain' from doing anything to profitably exploit the music is controlling and precludes application of any implied covenant." *Id.* at 802. The plaintiff, in turn, argued that, where a contract gives a party discretionary power, that power must be exercised in good faith.

The court posed the issue that is particularly apt here: "When an agreement expressly gives to one party *absolute discretion* over whether or not to perform, when should the implied covenant of good faith and fair dealing be applied to *limit* its discretion?" *Id.* (emphasis added). In answering that question, the court looked first to a California Supreme Court case, *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*, 2 Cal. 4t 342 (1992). There, the parties entered into a lease agreement which provided, *inter alia*, that, if the tenant found a potential sublessee and asked the landlord for consent to sublease, the landlord had the right to terminate the lease, enter into negotiations with the prospective sublessee, and appropriate for itself all profits. The *Carma* court noted that the implied covenant of good faith and fair dealing has particular application in situations where one party is invested with discretionary power affecting the rights of the other; such discretionary power must be exercised in good faith. However, the *Carma* court ultimately upheld the right of the landlord to terminate the lease in order to claim for itself all profit from the expected sublease. The landlord's right arose from an express term in the parties' agreement, and, in general, an implied term should not be read to vary

10

an express term.

The *Third Story* court recognized the tension in *Carma* and stated that it would try to reconcile the "apparent inconsistency between the principle that the covenant of good faith should be applied to restrict exercise of a discretionary power and the principle that an implied covenant must never vary the express terms of the parties' agreement." *Third Story*, 41 Cal. App. 4th at 804. The court noted first that it must take into account

> a long-established rule concerning implied covenants. To be imposed "'(1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract.'"

*Id.*

The *Third Story* court went on to discuss several cases "cited in *Carma* for the proposition that a discretionary power must be exercised in good faith." *Id.* For example,

> [i]n *Perdue v. Crocker National Bank* (1985) 38 Cal. 3d 913, a bank was given discretion to set nonsufficient (NSF) charges to be paid by the customer. The contention was made that since the charges were subject to the bank's sole discretion, the contract lacked mutuality and was, in fact, illusory. (*See Automatic Vending Co. v. Wisdom* (196) 182 Cal. App. 2d 354, 356 ["'An agreement that provides that the price to be paid, or other performance to be rendered, shall be left to the will and discretion of one of the parties is not enforceable.'"] By its ruling that "'under California law, an open term in a contract must be filled in by the party having discretion within the standard of good faith and fair dealing,'" the court in *Perdue* was able to impose an objective standard and save an otherwise illusory agreement.

*Third Story*, 41 Cal. App. 4th at 804.

The *Third Story* court went on to explain that, in *Perdue* and other similar cases,

> the courts were forced to resolve contradictory expressions of intent from the parties: the intent to give one party total discretion over its performance and the intent to have a mutually binding agreement. In that situation, imposing the duty of good faith creates a binding contract where, despite the clear intent of the parties, one would not otherwise exist. Faced with that choice, courts prefer to imply a covenant at odds with the express language of the contract rather

11

> than literally enforce a discretionary language clause and therefore render the agreement unenforceable.

*Id.* In short, the implied covenant was applied "to contradict an express contractual grant of discretion when necessary to *protect* an agreement which would otherwise be rendered illusory and unenforceable" – *i.e.*, in order to effectuate the parties' intent to enter into a binding contract. *Id.* at 806 (emphasis added); *see also id.* at 804-06 (discussing case and noting that "[t]he tendency of the law is to avoid the finding that no contract arose due to an illusory promise when it appears that the parties intended a contract") (internal quotation marks omitted). But, the *Third Story* court asked, "[d]oes a different result ensue where the contract is unambiguous, otherwise supported by adequate consideration, and the implied covenant is not needed to effectuate the parties' expressed desire for a binding agreement? We believe it does . . . ." *Id.* at 806.

The *Third Story* court looked at cases cited in *Carma* where the implied covenant was *not* applied to limit an express contractual provision giving complete discretion to one party. For example,

> [i]n *Brandt v. Lockheed Missiles & Space Co.*, the employment contract at issue provided that when an employee's invention was deemed of sufficient value to apply for a patent and the patent application was granted, the employee would in all cases receive a total of $600. In addition, the agreement said the employer "may, but is not obligated" to grant to any employee an additional "Special Invention Award." In response to two employees' claims that failure to make an adequate Special Invention Award in their case violated the covenant of good faith, the court held: "Few principles of our law are better settled, than that '[t]he language of contract is to govern its interpretation, if the language is clear and explicit. . . .' [¶] Here the language of the parties' contract of employment, i.e., the patent plan, could not be more clear and explicit. It says Lockheed's Invention Awards Committee '*may, but is not obligated to* grant a Special Invention Award,' and that its decision on such matters 'shall be *final and conclusive*.' Lockheed had fully respected the patent plan's language; it may not reasonably be said that in doing so it violated a 'duty of good faith and fair dealing.'" (154 Cal. App. 3d at ¶. 1129-1130.)

*Third Story*, 41 Cal. App. 4th at 807.

The *Third Story* court emphasized that, in *Brandt* and the other like cases,

> one of the parties was expressly given a discretionary power *but regardless of how such power was exercised, the agreement would have been supported by adequate consideration*. There was no tension between the parties' express agreement and their intention to be bound, and no necessity to impose an implied covenant to create

12

> mutuality. The conclusion to be drawn is that courts are not at liberty to imply a covenant directly at odds with a contract's express grant of discretionary power except in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement. In all other situations where the contract is unambiguous, the express language is to govern, and "[n]o obligation can be implied . . . which would result in the obliteration of a right expressly given under a written contract."

*Id.* at 808 (emphasis added).

Ultimately, the *Third Story* court found that the case before it was more like *Brandt* than *Perdue*.

> The illusory promise [*i.e.*, that the defendant could at its election refrain from all marketing efforts] was not . . . the only consideration given by the [the defendant]. Under paragraph 33 of the 1977 agreement and paragraph 34 of the 1972 agreement, [the defendant] promised to pay [the plaintiff] a guaranteed minimum amount no matter what efforts were undertaken. It follows that, whether or not an implied covenant is read into the agreement, the agreement would be supported by consideration and would be binding.

*Id.* The court added that, while the guaranteed payments did not appear to be large, "unless the consideration given was so one-sided as to create an issue of unconscionability, the courts are not in a position to decide whether legal consideration agreed to by the parties is or is not fair." *Id.* at 808 n.5.

The question for the Court is whether the instant case is more like *Perdue*, where the implied covenant was found to apply and thus restricted defendant's discretion, or *Brandt* and *Third Story*, where the implied covenant was found not to contravene an express provision conferring complete discretion on the defendant. The Court finds the latter applies.

Regardless of how YouTube exercised its discretionary power in determining whether to display advertisements under the Partner Program Terms, the agreement (which consists of both the TOS and Partner Program Terms) between Zombie and YouTube was supported by adequate independent consideration. In particular, YouTube allowed Zombie to post videos on its forum free of charge in exchange for getting a license to its content. *See* Hawkins Decl., Ex. 1 (YouTube Partner Program Terms) (providing that, "[t]ogether with the YouTube Terms of Service [TOS] and the YouTube Partner Program policies . . . , the following YouTube Partner Program Terms

13

1  apply to your participation in the YouTube Partner Program"); Hawkins Decl., Ex. 2 (TOS ¶ 6.A-
2  C) (providing that, "[a]s a YouTube account holder you may submit Content to the Service" and
3  that "you retain all of your ownership rights in your Content [but], by submitting Content to
4  YouTube, you hereby grant YouTube a worldwide, nonexclusive, royalty-free, sublicenseable and
5  transferable license to use, reproduce, distribute, [etc.] the Content in connection with the Service
6  and YouTube's . . . business"). The ability to post videos, even without advertising revenues, can
7  be valuable to content providers in reaching a wide audience. Moreover, the YouTube Partner
8  Program encompassed more than just advertising revenues; content can be monetized in other
9  ways such as subscription revenues. *See* Hawkins Decl., Ex. 1 (YouTube Partner Program Terms)
10 (providing that "YouTube will pay you 55% of the total net revenues recognized by YouTube
11 from subscription fees that are attributable to the monthly views or watchtime of your Content as a
12 percentage of the monthly views or watchtime of all or a subset of participating content in the
13 relevant subscription offering (as determined by YouTube)").[6] Accordingly, the provision of the
14 Partner Program Terms conferring upon YouTube complete control over decisions regarding
15 advertisements need not be deemed subject to the implied covenant of good faith and fair dealing
16 in order to prevent the agreement from being illusory.
17       To the extent Zombie suggests that YouTube does not in fact have *complete* discretion
18 under the YouTube Partner Program Terms, that argument has no merit. According to Zombie,

> [t]he Partner Program Policies note[] that failing to comply with these policies could result in *disabling ads from your content*, making the default assumption that ads are not disabled form content. Further, the "Monetization Basics & Policies Pages" incorporated into the Partner Program Policies outline[] how ads will be served onto videos that are approved for the Partner Program, and goes as far to note that "[o]nce you turn on monetization, it may take some time for ads to appear," not that ads may not appear at all.

24 Opp'n at 21 (emphasis in original). This provision does not negate the sweeping force of the clear

---

[6] One could argue that the subscription revenue term also gives discretionary authority to YouTube that should be limited by the implied covenant. However, Zombie made no such argument in its papers. And even though Zombie did raise the argument at the hearing, the discretion is fairly limited in nature – *i.e.*, allowing YouTube to determine what the "subset of participating content" is.

14

and explicit provision: "YouTube is not obligated to display any advertisements alongside your videos." Nothing in the Partner Program Policies suggests that violation of the policies is the *only* reason why YouTube is not obligated to display advertisements; it is simply one reason.

### III. CONCLUSION

Accordingly, the Court agrees with YouTube that all of Zombie's claims (the § 17200 claim; the claims for breach of contract, the implied covenant, and quasi-contract; and the claim for tortious interference) are subject to dismissal given the explicit terms of the agreement. Moreover, the dismissal is with prejudice. YouTube challenged Zombie's original complaint on the same ground, which led to Zombie filing an amended complaint. Because Zombie's amended complaint failed to cure the deficiency, and because the terms of the agreement are clear, any further amendment to the complaint would be futile.

For the foregoing reasons, YouTube's motion to dismiss is granted. The dismissal is with prejudice. Accordingly, the Clerk of the Court shall enter judgment in accordance with this opinion and close the file in this case.

This order disposes of Docket No. 29.

**IT IS SO ORDERED**.

Dated: March 7, 2018

_____
EDWARD M. CHEN
United States District Judge